**LAMAR ADVANTAGE GP COMPANY, Appellant**

v.

**ZONING HEARING BOARD OF ADJUSTMENT OF the CITY OF PITTSBURGH, and City of Pittsburgh.**

Commonwealth Court of Pennsylvania.

Argued April 19, 2010.

Decided June 23, 2010.

---

Samuel P. Kamin, Pittsburgh, for appellant.

Blaine A. Lucas, Pittsburgh, for appellees.

BEFORE: SIMPSON, Judge, and BUTLER, Judge, and KELLEY, Senior Judge.

OPINION BY Judge SIMPSON.

In this complex zoning appeal, Lamar Advantage GP Company (Lamar) asks whether the Zoning Board of Adjustment of the City of Pittsburgh (ZBA) erred in denying its requests to install two large advertising signs on a five-story public parking garage in the City of Pittsburgh. Before the ZBA, Lamar asserted it was entitled to install the signs pursuant to the doctrines of vested rights or equitable estoppel based on a previously issued sign permit that was later revoked with Lamar's consent. Alternatively, Lamar sought variances for the signs. With one of its members recusing, a two-member ZBA rendered a split decision, resulting in what the ZBA, and the Court of Common Pleas of Allegheny County (trial court) determined to be a denial of Lamar's requested relief. Lamar raises numerous procedural and substantive issues. Upon review, we affirm.

## I. Background

The ZBA's findings may be summarized as follows. The property at issue is located at 55 11th Street, at the corner of Liberty Avenue and the terminus of Grant Street in the City of Pittsburgh (subject property). The subject property lies within a GT–B (Golden Triangle, Subdistrict B) Zoning District. The Pittsburgh Parking Authority (Authority) is the owner of the 3.58–acre subject property and has constructed a five-story public parking garage building, known as the Grant Street Transportation Center, on the site. The site is bisected by a railroad line with two trestles located on the subject property.

Lamar proposes to erect both a 1,098 square foot Light Emitting Diode (LED) advertising sign and a 1,082.5 square foot Electronic Message Sign (ticker sign) on the subject property. The estimated cost for each sign, as indicated on Lamar's applications, is $3,500,000.

In 2003, the Authority issued a request for proposal for designs for the parking garage to be constructed at the subject property. Ultimately, IKM Incorporated (IKM) was selected to provide architectural services for the project.

As part of its original proposal for the project, IKM envisioned a number of large LED signs around the building. However, through the design and value engineering processes, the sign concept was first limited to a video board on the cylindrical corner piece of the building and then eliminated from the design, apparently because the Authority could not justify the cost of that design component.

During the design process, the Authority did not consider or investigate the requirements of the City of Pittsburgh Zoning Code (Code) with respect to conceptual signs. The Pittsburgh Planning Commission approved a project development plan for the parking garage without an LED sign or a ticker sign.

IKM continued to promote the concept of a video board component to the design of the parking garage building and sought out parties that might be interested in financing it. Lamar was approached with the scheme of financing the LED sign and the ticker sign. In December 2007, Lamar entered into a license agreement with the Authority for the installation of the LED sign and the ticker sign. Although the ticker sign required a dimensional variance from the Code's size limitations, as well as a conditional use approval, Lamar did not apply for those approvals prior to entering into the license agreement.

Shortly before Lamar entered into the licensing agreement, the Zoning Administrator approved the LED sign as a "minor amendment" to the approval for the parking garage building and issued Sign Permit 07–08817, which indicated an estimated cost of the sign of $5,000.

After issuance of the sign permit, Lamar erected a temporary vinyl banner sign on the partially-constructed building on the subject property. The text of the banner advertised an exhibit at the Sports Museum that celebrated the Steelers' 75th season. The banner did not indicate it was intended as notice of the issuance of a permit for the LED sign. The banner remained in place for at least 30 days prior to when construction commenced on the LED sign.

In March 2008, within 30 days of when construction of the LED sign became apparent, Councilman Patrick Dowd filed a protest appeal contesting issuance of the sign permit. Shortly thereafter, several other members of city council also filed a protest appeal. Lamar responded by filing a civil action against the various city council members with the trial court.

In April 2008, Lamar, Councilman Dowd, and the City executed a Memorandum of Understanding. Pursuant to the Memorandum of Understanding, Lamar agreed the City would revoke the sign permit with the condition that Lamar would be permitted to appeal this revocation to the ZBA and would be permitted to file an application for a variance for the sign then under construction. Lamar agreed to abide by a stop work order and withdrew its civil action against the council members. Shortly thereafter, Lamar filed its applications for variances for the LED sign and the ticker sign.

## II. ZBA Proceedings

### A. Hearing

In September 2008, the ZBA, which is comprised of three members, held a hearing on both the revocation of Lamar's sign permit and its variance applications. At the commencement of the hearing, ZBA member David F. Toal, Esquire, recused himself from the proceeding based on a conflict of interest. Therefore, a two-member ZBA presided over this proceeding.

At hearing, several witnesses testified both on behalf of Lamar and in opposition to Lamar's requested relief.

With regard to its sign permit, Lamar presented evidence concerning its claim of a vested right in the issuance of the permit. As to its variance applications, Lamar presented evidence intended to meet the standards for variances under the Code and Pennsylvania law. A number of interested persons, including several members of city council, appeared to present their concerns regarding the proposed signs.

Lamar presented the testimony of John Schrott, the project architect for IKM, who described the history of the project design and the concept of the LED sign as a design element for the parking garage. Schrott acknowledged the sign regulations in the Code were not considered when the design was developed. Schrott also conceded that the City's Design Review Commission was not in favor of the video board component of the project. Nevertheless, Schrott opined that the designs would benefit the public because the LED sign could be used to announce public events and for broadcasts of local interest.

Lamar also presented testimony by Richard Glance, an architect and urban planner, who opined the sign would not negatively impact the public health, safety, and welfare. Glance opined the LED sign was an appropriate architectural feature for the building on the subject property because it was designed to be an integral part of the building and because it would provide a visual impact for a unique urban location. Glance described the view corridors of the LED sign and opined, among other things, the LED sign would not impact The Pennsylvanian, an historic building with multiple residential units, located across the street from the subject property. Glance also opined the height of the

LED sign was necessary to fit the scale of the building and the size was necessary to make it fit within the architecture so it did not appear to be an afterthought. He also noted the ticker sign needed to start and stop at a logical place and needed to be constructed at the size proposed in order to be effective. Glance did not refer to the applicable provisions of the Code in his testimony.

David Onorato, the Authority's executive director, related the history of the project's design. He testified that both the LED and the ticker signs would serve as additional revenue sources for the Authority. Onorato noted that although the Authority was excited about the signs as design elements and amenities for the parking garage building, the Authority did not review the Code's requirements regarding signs. Rather, it relied on the architects for that information.

Susan Tymoczko, the City's zoning administrator, testified that she approved the application for the sign permit as a "minor amendment" to the approved project development plan for the building on the subject property based on her belief that it was in accordance with the City's regulations. She explained that she believed the City's administration reached an agreement with Lamar regarding the removal of six nonconforming advertising signs in exchange for approval of the LED sign.

In addition, Lamar presented the testimony of Stan Geier, its vice president and general manager in Pittsburgh. Geier testified that Lamar contacted various City officials regarding the LED sign and reached agreement for a "six-to-one swap" of the six nonconforming signs for the one LED sign. Geier testified the City had a practice of allowing this type of swap, but he did not identify any documentary support or legal authority for the practice. Geier testified that, after issuance of the

sign permit, Lamar erected the banner sign to serve as notice that an LED advertising sign was going to be installed. He conceded, however, that the temporary vinyl banner sign was not similar to the proposed LED sign. Geier also described the customized nature and costs of the LED sign. Geier testified Lamar spent $1.3 million on the sign to date, in unrecoverable costs, with additional costs of approximately $200,000 for workmen and consultants for the sign installation.

Also, Becky Rodgers, the executive director of Neighbors in the Strip, testified in support of the signs. She noted the existing Lamar signs near the subject property are eyesores and the LED and ticker signs would brighten up a blighted area.

In opposition to Lamar's appeal, Claire Meehan, a resident of The Pennsylvanian, presented a petition from 80 residents indicating opposition to the sign. She noted the signs would be visible at the primary entrance and exit of the building.

Donald Carter, also a resident of The Pennsylvanian and an architect, provided a copy of his letter to the editor of the Pittsburgh Post Gazette in which he described reasons for his opposition to the signs. Carter explained he was part of the developmental team that helped design the civic space at the intersection of Liberty Avenue and Grant Street, which is, in part, framed by the subject property. He noted there was an intent to preserve the vista down from Grant Street to the subject property, and the LED sign posed a negative impact. Carter also noted that the banner sign on the subject property during construction did not provide notice to the residents of The Pennsylvanian of an approval of any sign.

Greg Wimerskirch and Ann–Marie Lubenau, both architects, also testified in opposition to the sign. In addition, Dan Gilman, chief of staff to Councilman William Peduto, presented a letter on behalf of the councilman indicating his opposition to the proposed signs. Also, Douglas Shields, City Council President, appeared to oppose the LED sign and as an observer with respect to the ticker sign.

Bruce Kraus, a member of City Council, appeared as an observer and presented a number of documents, including an April 2008 letter from the City's solicitor regarding the "swap" agreement with Lamar. This letter stated that the Zoning Administrator acted appropriately in approving the application for the LED sign, but stated that "the practice of permitting by negotiations the approvals of LEDs in return for elimination of non-conforming billboards is not permitted by the Code, and the practice should cease prospectively." ZBA Op., Finding of Fact (F.F.) No. 53.

## B. ZBA Decision

After hearing, the two-member ZBA issued a split decision. Specifically, ZBA member Alice B. Mitinger issued a 17–page opinion, consisting of findings of fact and conclusions of law, setting forth the grounds for denial of Lamar's challenge to the revocation of its sign permit and its variance requests. ZBA Chair Wrenna L. Watson issued a two-page decision in which she explained she would have granted Lamar's requested relief. Both ZBA members agreed the effect of their divided vote acted as a legal denial of Lamar's requested relief.

In her opinion, Mitinger determined Lamar's evidence did not support a grant of relief on grounds of vested rights or equitable estoppel. Specifically, Mitinger found, as a company with a long history in the City, Lamar knew or should have known of the Code's prohibition on advertising signs in the GT–B Districts. Mitinger also found that although Lamar

presented testimony regarding the City's "past practices" of permitting "swaps" of non-conforming advertising signs for LED signs, it did not present any legal authority or written City policy or ordinance that would allow the relocation of nonconforming advertising signs on a different property. She further determined Lamar did not present any evidence addressing the Code's prohibition against advertising signs in the GT–B districts or the specific prohibition against relocating nonconforming advertising signs to a different location. Mitinger stated that, assuming Lamar was aware of the prohibition on advertising signs in the GT–B districts, its efforts to arrange a "swap" could only be viewed as an effort to circumvent the Code's prohibition against advertising signs in the GT–B districts. For these reasons, Mitinger determined Lamar did not exercise due diligence in attempting to comply with Code requirements. Further, Mitinger determined Lamar did not prove it acted in good faith in obtaining the sign permit. She also found the sign permit was not a valid permit and was properly revoked.

As to Lamar's variance requests for its LED and ticker signs, Mitinger determined Lamar did not present evidence of any unique conditions of the subject property that would result in unnecessary hardship absent the grant of the variances. Mitinger also found the variances sought would result in significant departures from Code requirements.

Ultimately, Mitinger concluded Lamar did not satisfy the requirements to establish a claim under the doctrine of vested rights as set forth in *Petrosky v. Zoning Hearing Board of Upper Chichester Township,* 485 Pa. 501, 402 A.2d 1385 (1979). In addition, Mitinger concluded Lamar did not meet the burden of proof on its equitable estoppel claim. Essentially, Mitinger

determined Lamar's lack of good faith and due diligence precluded either form of equitable relief.

As to Lamar's variance request for its LED sign, Mitinger determined, because the Code prohibited advertising signs in the GT–B District, Lamar was required to prove it satisfied the requirements for a use variance. Mitinger determined Lamar could not meet this burden given that the Authority was already using the subject property in conformity with the Code's requirements, and Lamar did not show a unique condition of the subject property that would result in unnecessary hardship absent the grant of the variance.

As to Lamar's request for a dimensional variance for its ticker sign, Mitinger determined Lamar's proposed sign represented a 350% increase from the applicable Code requirements for electronic sign messages. Mitinger determined the only justifications Lamar offered for this substantial deviation were its self-serving opinion that the sign would benefit the community and its claim that income derived from the sign would benefit the Authority. Mitinger concluded these claims were insufficient to justify the grant of the requested dimensional variance.

In short, Mitinger rejected Lamar's vested rights and equitable estoppel claims and denied its requests for variances for its LED and ticker signs.

As noted, ZBA Chair Wrenna Watson voted to grant Lamar's requested relief. Watson issued a short opinion in which she expressed her belief that Lamar presented sufficient evidence to establish its claim of vested rights and/or equitable estoppel. Lamar appealed to the trial court.

### III. Trial Court Decision

█ Without taking additional evidence, the trial court affirmed. Specifically, the trial court stated:

It is well established in this Commonwealth that a tie vote of a governmental body constitutes a negative decision rather than the absence of a decision.

Because Ms. Mitinger's decision was the prevailing decision, upholding the status quo, it is entitled to the same deference as any other majority decision and therefore the decision rendered by the [ZBA], including the findings of fact and conclusions of law, constitutes a decision required by Section 908(9) of [the Pennsylvania Municipalities Planning Code [1] (MPC) ].... Therefore, the standard of review to be employed by this Court is whether the [ZBA's] prevailing decision constituted an abuse of discretion or an error of law.

An extensive hearing was held before the [ZBA] on September 4, 2008, at which time Richard Glance, an Architect and Urban Planner who has extensive experience in urban restoration, testified as an expert witness as well as produced a number of exhibits on behalf of Lamar. In addition to Lamar, other parties were given the opportunity to present witnesses and evidence during this hearing.

The [ZBA] heard the witnesses and reviewed the exhibits. It is the duty of the [ZBA] in the exercise of its discretionary power to determine whether a party has met its burden.... Therefore, for the reasons stated above the prevailing decision of the [ZBA] is affirmed.

Tr. Ct., Slip Op., 6/24/09, at 2–3 (citations omitted). Lamar appealed to this Court.[2]

## IV. Issues

On appeal, Lamar raises seven assignments of error and asserts: the ZBA's tie vote required its sign permit to remain intact; the trial court erred in affirming the wrong proposed decision of the ZBA; the trial court improperly ruled on Lamar's appeal in violation of the trial court's own preliminary order and without affording Lamar due process; Lamar was entitled to modernize its sign pursuant to the doctrine of natural expansion of a nonconforming use; the ZBA misconstrued the holding of a prior decision by this Court; Lamar was entitled to retain its sign permit under the doctrine of vested rights and/or variance by estoppel; and, Lamar was entitled to variances for its LED and ticker signs.

## V. Discussion

### A. Effect of ZBA's Tie Vote

Citing *Young v. Department of Environmental Resources,* 144 Pa.Cmwlth. 16, 600 A.2d 667 (1991), Lamar first asserts the ZBA, on a tie-vote, cannot revoke a sign permit. Lamar argues it filed a *de novo* appeal from the revocation of its sign permit by the Zoning Administrator. It contends the ZBA conducted a *de novo* evidentiary hearing, and then recorded a tie-vote on whether to revoke its sign permit. On a tie-vote, the ZBA could not revoke its sign permit. Lamar maintains that, based on the procedural posture of this case, the trial court erred in adopting Mitinger's proposed decision, which alters the status quo and revokes the sign permit on a tie-vote. *See Giant Food Stores, Inc. v. Zoning Hearing Bd. of Whitehall Twp.,* 93 Pa.Cmwlth. 437, 501 A.2d 353 (1985). La-

---

1. Act of July 31, 1968, P.L. 805, as *amended,* 53 P.S. § 10908(9).

2. Because the parties presented no additional evidence after the ZBA's decision, our review is limited to determining whether the ZBA

committed an abuse of discretion or an error of law. *Allegheny W. Civic Council, Inc. v. Zoning Bd. of Adjustment of City of Pittsburgh,* 547 Pa. 163, 689 A.2d 225 (1997).

mar contends the trial court should have adopted and reviewed the proposed decision filed by ZBA Chair Wrenna Watson, which would not revoke its sign permit and would have allowed the status quo to continue unaffected.

■ As to the effect of a tie vote on the relief requested by a party, in *Kuszyk v. Zoning Hearing Board of Amity Township*, 834 A.2d 661 (Pa.Cmwlth.2003), this Court explained (with emphasis added):

It is now well settled that, absent a statutory or regulatory provision to the contrary, *when an administrative body is equally divided on the outcome of a matter before the body, the tie vote acts as a denial of the requested relief and the subject matter under consideration must remain in status quo.*

*Id.* at 665 (citations omitted).

Here, although Lamar asserts the Mitinger decision altered the status quo by revoking the permit for Lamar's LED sign, our review of the record belies this assertion. Specifically, the "Memorandum of Understanding" executed by Lamar and the City, states "Lamar agrees that the City of Pittsburgh Zoning Administrator may revoke the existing Sign Permit No. 07–08817 for the sign which is currently being erected at the Grant Street Transportation Center, 55 11th Street, 2nd Ward, Pittsburgh, Allegheny County, Pennsylvania." Reproduced Record (R.R.) at 369a. In addition, the Memorandum of Understanding states: "In order to protect its interest in the Sign Permit, Lamar may appeal the revocation of the Sign Permit to the [ZBA]." *Id.* The Memorandum of Understanding also provides: "Lamar will file or cause to be filed an Application for Variance with the [ZBA] concerning the sign now under construction." *Id.*

Consistent with the terms of the Memorandum of Understanding, the City's Zon-

ing Administrator issued a Memorandum in which she stated, "zoning approval for the advertising sign application *is hereby revoked,* and I am requesting that any permits related to this application be immediately revoked as well." R.R. at 442a (emphasis added). In turn, Lamar filed an application for approval of its LED sign, seeking variances or, in the alternative, asserting claims of vested rights, equitable estoppel, and natural expansion of a nonconforming use. Certified Record, Vol. II, Ex. 4. Clearly, Lamar bore the burden of proof on these claims. *E.g., Taliaferro v. Darby Twp. Zoning Hearing Bd.,* 873 A.2d 807 (Pa.Cmwlth.2005) (variance applicant bears burden of showing unnecessary hardship will result if a variance is denied and proposed use will not be contrary to public interest); *In re Kreider,* 808 A.2d 340 (Pa.Cmwlth.2002) (landowner bears burden of proof on vested rights and equitable estoppel claims); *Jones v. Twp. of N. Huntingdon Zoning Hearing Bd.,* 78 Pa. Cmwlth. 505, 467 A.2d 1206 (1983) (burden of proving existence and extent of nonconforming use is on property owner). Thus, the trial court properly determined the ZBA's tie-vote on Lamar's requests for relief resulted in denial of these claims. *Kuszyk.*

Support for this conclusion is found in this Court's decision in *Giant Food Stores,* cited by Lamar. There, this Court considered the following issue: "Where the two voting members of a zoning hearing board cast a divided one-to-one vote with respect to a request for a zoning use variance, has the board made a decision and, if so, does the decision constitute a denial of the requested variance?" Speaking through Judge Craig, this Court held:

If a zoning hearing board is functioning in an appellate mode with respect to a variance request, taken under consideration by it after a zoning administrator

has denied an application according to the zoning ordinance terms, then the divided vote of the board has precisely the same effect as a divided vote in an appellate court. It constitutes an affirmance of the denial of the application.

\* \* \*

When a legal or semi-legal tribunal consists of only two members, neither one of them can perform an affirmative act changing, or which may change, an existing condition; for it takes a majority of the whole body to do this, and one is not a majority of two ...

[W]hen a judicial or semi-judicial body is equally divided, the subject-matter with which it is dealing must remain in status quo.

When a zoning tribunal, by an evenly divided vote, refuses to depart from the status quo, the aggrieved party has the benefit of a statutory zoning appeal as a remedy....

*Id.* at 355, 356 (citation and quotation omitted). Thus, the effect of the ZBA's split vote here was to deny Lamar's appeal from the Zoning Administrator's revocation of Lamar's sign permit, and to reject Lamar's requests for variance or other equitable relief.

Further, this is not a case like *Young,* relied on by Lamar. There, the Department of Environmental Resources (DER) issued a notice revoking Young's certification as a sewage enforcement officer. Young appealed, and, after hearing, the four-member State Board for Certification of Sewage Officers (Board) issued an adjudication sustaining DER's revocation of Young's certification. The adjudication was signed by two of the Board members, with the other two Board members dissenting. The applicable DER regulation, stated, in relevant part, "[a]ctions and adjudications of the Certification Board *shall be by a vote of a majority of members*

present at a meeting called for consideration of the action or adjudication. Three members of the Certification Board constitute a quorum." *Young,* 600 A.2d at 668 (citing 25 Pa.Code § 72.58) (emphasis added). Another regulatory provision expressly placed the burden on DER to establish the violations giving rise to the decision to revoke an individual's certification. *Id.* at 668–69. Nevertheless, the Board attempted to revoke Young's certification without a majority vote. On further appeal, this Court reversed the Board's revocation of Young's certification, stating:

Here, in a [*de novo* ] hearing before the Board, DER bears the burden of proof by a preponderance of the evidence that the sewage enforcement officer certification of Young should be revoked for alleged violations. Such a determination must be by a vote of a majority of Board members. Since there was no majority vote to take the requested action of revoking Young's certification, the Board's equally divided vote must be viewed as a denial of the action requested of the Board, and DER's revocation of Young's certification must be reversed.

*Id.* at 669.

Unlike *Young,* this case does not involve state regulatory provisions that specifically delineate the burden of proof and require a majority vote to revoke a certification. In this case, Lamar bore the burden of proving entitlement to the relief sought. The ZBA's tie-vote here results in denial of Lamar's requested relief. *Giant Food Stores.*

■ As to the appropriate scope and standard of review in a case such as this, our decision in *Danwell Corp. v. Zoning Hearing Board of Plymouth Township,* 115 Pa.Cmwlth. 174, 540 A.2d 588 (1988), is instructive. There, a zoning board rendered a two-to-two vote on whether to

approve an applicant's special exception application. The zoning board issued a written decision containing findings of fact and conclusions of law in which it denied the application. Only the two board members who voted against the application signed the decision. Before this Court, the applicant asserted the zoning board's split decision did not constitute a valid decision under Section 908(9) of the MPC (requiring board to issue written decision within 45 days of last hearing). Speaking through Judge Craig, we rejected this argument, stating:

> [I]n response to [the applicant's] argument that findings of fact signed by only two members of a four-person board are not effective under section 908(9) of the MPC, we refer to our decision in [*Giant Food.*] ... *The procedures followed in Giant Food demonstrate that findings of fact signed by only one-half of a board's members are an effective basis for review on appeal.*

> We conclude that the denial decision rendered by the board, including its findings of facts and conclusions of law, constituted the decision required by section 908(9) of the MPC. *The trial judge acted correctly in limiting his review of the board's decision to a determination of whether the board abused its discretion or committed an error of law.*

*Danwell,* 540 A.2d at 591 (emphasis added).

Based on *Danwell,* we review Mitinger's decision, which was signed by one member of the two member-ZBA, and which contains findings of fact and conclusions of law and provides an effective basis for appellate review. Thus, as in *Danwell,* the trial court acted appropriately here in reviewing Mitinger's decision for abuse of discretion or error of law.

## B. Additional Evidence

Lamar next contends the trial court improperly ruled on its appeal without affording it due process and in violation of the trial court's own preliminary order. Lamar asserts that, in its preliminary order, the trial court directed the parties to file briefs as to the standard of review when the ZBA is split one-to-one and both members file separate opinions, and whether the record should be expanded to include the testimony of an employee of the City Planning Department. Lamar contends the trial court then ignored the preliminary nature of its order by issuing a final decision after receiving briefs from the parties rather than permitting Lamar to supplement the record.

Lamar further argues the trial court did not determine whether the record was full and complete as required by Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754(b). Lamar maintains the trial court denied it the opportunity to show due cause why it could not raise additional issues and denied it notice and an opportunity to be heard on its claims for equitable relief. Lamar also asserts the trial court denied Lamar the basic right to be heard on the issues involved in its appeal.

At the outset, we note that the MPC does not apply to appeals of decisions of the ZBA. *See Frey v. Zoning Bd. of Adjustment of City of Pittsburgh,* 74 Pa.Cmwlth. 360, 459 A.2d 917 (1983). Rather, the Local Agency Law applies here. *Id.* Section 753(a) of the Local Agency Law states, in relevant part:

> [I]f a full and complete record of the proceedings before the agency was made such party may not raise upon appeal any other question not raised before the agency (notwithstanding the fact that the agency may not be competent to resolve such question) unless allowed by the court upon due cause shown.

2 Pa.C.S. § 753(a). In addition, Section 754 of the Local Agency Law states, as pertinent:

(a) **Incomplete record.**—In the event a full and complete record of the proceedings before the local agency was not made, the court may hear the appeal de novo, or may remand the proceedings to the agency for the purpose of making a full and complete record or for further disposition in accordance with the order of the court.

(b) **Complete record.**—In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. . . .

2 Pa.C.S. § 754.

■ A "full and complete record" is defined as "a complete and accurate record of the testimony taken so that the appellant is given a base upon which he may appeal and, also, that the appellate court is given a sufficient record upon which to rule on the questions presented." *In re Thompson*, 896 A.2d 659, 668 (Pa.Cmwlth. 2006) (citation omitted).

■ Here, it is clear the trial court determined the record made before the ZBA was full and complete and, as such, it was compelled to hear Lamar's appeal on the record certified by the ZBA. 2 Pa.C.S. § 754(b). Further, our review of the record reveals Lamar did not formally seek to supplement the record on appeal from the ZBA's decision. We decline to fault the trial court for failing to conduct an evidentiary hearing on its own accord where Lamar did not persuade the trial court that the record made before the ZBA was not full and complete.

To that end, in its preliminary order, the trial court directed the parties to brief the issue of whether "the record should be

expanded to include testimony of an employee of the City Planning Department." R.R. 836a. Upon review, we discern no abuse of discretion in the trial court's decision that supplementation of the record was unnecessary based on the assertions in the parties' briefs.

■ More specifically, before the trial court, Lamar argued "additional evidence [was necessary] on the issue of the past practice of the City regarding the reduction and modernization of Lamar's signs." R.R. at 847a. Specifically, Lamar asserted it sought to present the testimony of City Environmental Specialist Daniel Sentz, a witness who, according to Lamar:

would provide the [trial court] with evidence regarding the procedure established by the City in granting permits for billboards over the past three administrations. Only through a *de novo* hearing can the [trial court] render sustainable findings regarding, *inter alia*, the past practices between the parties, the length of time that the parties had adhered to these practices, whether Lamar acted with due diligence and in good faith by adhering to these past practices, and the effect of these practices on the zoning matter now at issue.

R.R. at 847a.

As to the issue of the City's practice of entering into "swap" agreements for the removal of nonconforming billboards in exchange for the erection of LED signs, the ZBA made the following pertinent finding:

*Although Lamar presented testimony regarding the City's "past practice" of permitting "swaps" of nonconforming advertising signs for LED signs, it did not present evidence of any legal authority or written City policy or ordinance that would allow the "relocation" of nonconforming advertising signs on a different property. Lamar also did*

not present any evidence addressing the Zoning Code's specific prohibition against advertising signs in the GT–B District or the specific prohibition against relocating nonconforming advertising signs to a different location. Assuming that Lamar must have been aware of the prohibition against advertising signs in the GT–B District, its efforts to arrange a "swap" can only be viewed as an effort to circumvent the Code's prohibition against advertising signs in the GT–B District.

F.F. No. 54 (emphasis added); *see also* Concl. of Law No. 10.

As is evident from the above-excerpted finding, Lamar did, in fact, present evidence regarding the City's alleged "past practice" of permitting swaps of non-conforming signs for LED signs before the ZBA. *See* R.R. at 647a–49a. However, the ZBA was not persuaded by this evidence. This is not surprising given that when ZBA member Mitinger questioned Lamar's witness on this issue, he was unable to provide any support for his testimony concerning the City's past practice of authorizing "swap" agreements. R.R. at 648a–49a. Indeed, Lamar's witness acknowledged this "past practice" was not memorialized in any manner. R.R. at 649a. Additionally, an April 2008 letter from the City's solicitor regarding the City's "swap" agreement with Lamar, which Lamar presented at the ZHB hearing, indicated, "the practice of permitting by negotiations the approvals of LEDs in return for elimination of non-conforming billboards *is not permitted by the Code,* and the practice should cease prospectively." F.F. No. 53 (emphasis added).[3]

Because Lamar already presented evidence before the ZBA regarding the City's undocumented and unsupported "past practice" of permitting "swap" agreements, and because Lamar's offer of proof did not specifically indicate what new information it sought to present, no abuse of discretion is evident from the trial court's decision not to permit additional testimony on this point. *See* Pa.R.E. 403 (exclusion of relevant evidence based on needless presentation of cumulative evidence).

■ Further, Lamar faults the trial court for prematurely deciding this matter and not permitting it to raise several additional issues on appeal from the ZBA's decision. However, no error is apparent in this regard. The issues raised by Lamar in its appeal to the trial court were essentially the same issues it presented to the ZBA. The trial court properly reviewed the ZBA's decision for error of law or abuse of discretion. 2 Pa.C.S. § 753(a). To the extent Lamar presented issues not presented to the ZBA, these issues were waived. *Id.; Roomet v. Bd. of License & Inspection Review,* 928 A.2d 1162 (Pa. Cmwlth.2007) (Section 753(a) of the Local Agency Law incorporates the waiver doctrine by requiring all legal questions be raised before the administrative agency hearing the appeal).

## C. Natural Expansion of Nonconforming Use

Lamar further contends it is entitled to modernize an existing sign on the subject property to the proposed LED sign under the doctrine of natural expansion of a nonconforming use. It argues the provisions of the Code are more than general enough

---

**3.** *Compare* Section 14–1604(10)(a) of the City of Philadelphia Zoning Code (for each outdoor advertising and non-accessory sign erected in conformance with the Philadelphia

Zoning Code, an existing sign or signs encompassing equal or greater sign area shall be removed).

to embrace an LED sign as an extension of Lamar's existing nonconforming signs.

A lawful, nonconforming use of a property is a use predating a subsequent prohibitory zoning restriction. *Hafner v. Zoning Hearing Bd. of Allen Twp.*, 974 A.2d 1204 (Pa.Cmwlth.2009). The right to maintain a nonconforming use is only available for uses that were lawful when they came into existence and which existed when the ordinance took effect. *Id.* It is the burden of the party proposing the existence of such a use to establish both its existence and legality before the enactment of the ordinance at issue. *Id.* "This burden includes the requirement of *conclusive proof by way of objective evidence* of the precise extent, nature, time of creation and *continuation of the alleged nonconforming use.*" *Jones,* 467 A.2d at 1207 (emphasis added).

"*The manner of use* and the *dates of its existence are questions of fact on* which a reviewing court defers to the factfinder; however, the legality of a use is a question of law over which our review is plenary." *Hafner,* 974 A.2d at 1211 (emphasis added).

As to the limitations on the protections afforded nonconforming uses, in *Hanna v. Board of Adjustment of Borough of Forest Hills,* 408 Pa. 306, 183 A.2d 539 (1962), our Supreme Court stated:

> The use of property which the ordinance protects, or 'freezes,' is the use which was in existence at the time of the passage of the ordinance or the change of a use district but it offers no protection to a use *different* from the use in existence when the ordinance was passed. The latter does not render the ordinance invalid. The nonconforming use which is within the orbit of protection of the law and the Constitution is the nonconforming use which exists at the time of the passage of the zoning ordinance or the change in a use district under a zoning ordinance, not a *new* or *different* nonconforming use....

*Id.* at 313–14, 183 A.2d at 543–44 (citations omitted) (emphasis in original).

However, this rule is subject to the doctrine of natural expansion, which gives a landowner the right to expand "as required to maintain economic viability or to take advantage of increases in trade" so long as the expansion is not detrimental to the public welfare, safety and health. *Smalley v. Zoning Bd. of Middletown Twp.,* 575 Pa. 85, 99, 834 A.2d 535, 543 (2003) (citations omitted). "However, these protections are applicable only to *nonconforming uses* ... and nonconforming structures ... have no protected right to expand in violation of the applicable regulations." *Lamar Adver. Co. v. Zoning Hearing Bd. of Municipality of Monroeville,* 939 A.2d 994, 1002 (Pa.Cmwlth.2007), *appeal denied,* 600 Pa. 751, 965 A.2d 246 (2008) (quoting *Nettleton v. Zoning Bd. of Adjustment of City of Pittsburgh,* 574 Pa. 45, 51, 828 A.2d 1033, 1037 n. 3 (2003)) (emphasis in original).

Despite its assertions that it is entitled to modernize an existing sign on the subject property to its proposed LED sign under the doctrine of natural expansion, in its brief Lamar offers no explanation as to how the existing sign constitutes a valid non-conforming use. Further, our review of the transcript before the ZBA reveals no testimony that the sign on the subject property existed lawfully prior to a prohibiting Code enactment or amendment. Thus, it is not surprising the ZBA made no findings that could support a conclusion that the existing sign was, in fact, a valid nonconforming use.

Nevertheless, even if Lamar established an existing sign on the subject

property constituted a valid nonconforming use, the modernization or expansion sought by Lamar is inconsistent with the Code's provisions on nonconforming advertising signs. More particularly, the Code states, as pertinent:

**919.02.N Nonconforming Advertising Signs**

*A nonconforming advertising sign may be continued only as provided in this section:*

1. Normal maintenance of a nonconforming sign may occur, including any necessary repairs or alterations which do not enlarge, extend, or intensify the nonconformity;

2. *No structural alteration, enlargement, or extension shall be made of a nonconforming sign,* except when the alteration is required by law or will eliminate the nonconforming condition;

3. *Shall not be moved to a different location;*

4. Poster paper and panel copy boards may be replaced. Painted bulletin boards may be repainted. . . .

Section 919.02.N of the Code (emphasis added). In addition, the Code provides, in relevant part:

**921.03.E Relocation**

The [ZBA] may authorize, *as a special exception,* a structure containing a nonconforming use to be moved to another location on the same lot, provided that the [ZBA] determines that such a move will not have the effect of increasing the degree of nonconformity.

**921.03.F Nonconforming Signs**

Nonconforming signs shall be subject to the noncomplying structure regulations of this section, as modified by the following:

1. Nonconforming signs may be repaired, provided that *no structural al-terations shall be made which increase the area of the advertising matter;*

2. *Nonconforming signs may not be enlarged, added to or replaced by another nonconforming sign or by a nonconforming use or structure,* except that the substitution or interchange of poster panels and painted boards on nonconforming signs shall be permitted. . . .

Sections 921.03.E, F of the Code (emphasis added).

Here, the alleged nonconforming sign currently located on the subject property is 72 square feet. Lamar's proposed LED sign would be 1,098 square feet, or more than *15 times* the size of the existing sign and would be located on a different portion of the subject property. Clearly, the above-cited Code provisions, which prohibit alteration, enlargement or extension of a nonconforming sign as well as increases in the area of an advertising sign, would operate to bar Lamar's proposed expansion.

### D. ZBA's Application of Recent Case Law

Lamar further contends the ZBA erred in relying on this Court's decision in *Municipality of Monroeville* as support for its denial of Lamar's requested relief here because that case is distinguishable.

Here, in its conclusions of law, the ZBA stated:

8. In [*Municipality of Monroeville*], the Commonwealth Court considered whether a change from conventional billboard signs to LED signs was a change simply to the "sign face" or constituted a significant change to the billboard structure, necessitating appropriate zoning approvals. The court concluded that LED screens required significant structural alterations to the conventional billboard structures and thus were not

exempt from the required zoning approvals.

\* \* \*

11. The ... Code explicitly prohibits advertising signs in the GT–B District. Section 919.02.A. The ... Code also prohibits moving nonconforming advertising signs to a different location. Section 919.02.N.2. Nonconforming signs cannot even be relocated on the same lot without approval as a special exception. Section 921.03.E. Thus, as a matter of law, an advertising sign, even as the relocation of a single nonconforming advertising sign, is not permitted on the [s]ubject [p]roperty. Further, as the Commonwealth Court noted in [*Municipality of Monroeville* ], the change from a conventional billboard to an LED screen requires substantial structural changes which require appropriate zoning approvals.

Concls. of Law Nos. 8, 11. No error is apparent in the ZBA's discussion and application of *Municipality of Monroeville.*

Specifically, in *Municipality of Monroeville,* this Court considered whether a zoning board properly determined that Lamar's proposal to replace vinyl copy on 17 of its billboards with LED signs required conditional use and site plan approval under the applicable zoning ordinance. Responding to this issue, we first determined that, although Lamar sought to make this proposed change pursuant to the doctrine of natural expansion of a nonconforming use, Lamar did not establish the signs at issue were, in fact, valid nonconforming uses. We further determined that even if Lamar proved the signs were valid nonconforming uses, it did not comply with applicable zoning ordinance provisions that required it to obtain a special exception to alter the signs at issue. Thus, we stated, "Lamar lacks any basis to advance its claim to a modernization or expansion of

its billboards as a matter of right." *Id.* at 1003. Also, interpreting the applicable zoning ordinance provisions, this Court determined Lamar was required to obtain zoning approval and site permits for its proposed change from conventional signage to an LED-type signage.

We agree with the ZBA that *Municipality of Monroeville* is applicable here. More specifically, here, as in that case, Lamar did not prove its pre-existing sign constituted a valid nonconforming use, and, therefore, it may not "modernize" its advertising sign under the doctrine of natural expansion of a nonconforming use. Moreover, as in *Municipality of Monroeville,* even if Lamar proved the existence of a valid nonconforming use, applicable Code provisions prohibit the significant expansion and transformation proposed by Lamar. Additionally, as in *Municipality of Monroeville,* Lamar's construction of its proposed LED sign, which is prohibited in the GT–B district, necessitates zoning relief. In short, no error is apparent in the ZBA's discussion and application of *Municipality of Monroeville,* which is directly applicable to the facts presented here.

### E. Vested Rights/Variance by Estoppel

 Lamar further maintains the ZBA erred in determining it was not entitled to relief under the doctrine of vested rights. It argues the evidence established it acted with due diligence and in good faith in complying with the Code. Lamar also asserts it expended substantial, unrecoverable funds in reliance on the sign permit and revocation of the permit would cause undue hardship. Finally, Lamar argues there was no evidence that its sign would adversely affect individual property rights or the public health, safety or welfare.

Alternatively, Lamar contends it is entitled to a variance by estoppel. It argues

that if the "swap" arrangement, upon which its permit was premised, violated the law, the City knew or should have known of the alleged violation when it acted consistent with that arrangement. Lamar further maintains the City knew or should have known of the alleged Code violation when its zoning administrator issued the sign permit and when Lamar began construction of its sign. Lamar asserts the evidence established its good faith reliance on the validity of the arrangement. It also asserts it expended substantial sums in reliance on the permit, and it would suffer undue hardship if it were denied relief.

This Court may not substitute its interpretation of the evidence for that of the ZHB. *Taliaferro*. It is the function of a ZHB to weigh the evidence before it. *Id.* The ZHB is the sole judge of the credibility of witnesses and the weight afforded their testimony. *Id.* Assuming the record contains substantial evidence, we are bound by the ZHB's findings that result from resolutions of credibility and conflicting testimony. *Id.* Also, as Lamar point out, review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in zoning matters. *Id.* Capricious disregard occurs only when the fact-finder deliberately ignores relevant, competent evidence. *Id.* Capricious disregard of evidence is a deliberate and baseless disregard of apparently reliable evidence. *Id.*

Discussing the closely related equitable doctrines of vested rights, variance by estoppel and equitable estoppel, which operate to bar a municipality from enforcing its land use regulations, this Court explained:

A variance by estoppel is one of three labels assigned in Pennsylvania land use/zoning law to the equitable remedy precluding municipal enforcement of a land use regulation. Our courts have generally labeled the theory under which a municipality is estopped: (1) a "vested right" where the municipality has taken some affirmative action such as the issuance of a permit; [ (2) ] a "variance by estoppel" where there has been municipal inaction amounting to active acquiescence in an illegal use; or [ (3) ] "equitable estoppel" where the municipality intentionally or negligently misrepresented its position with reason to know that the landowner would rely upon the misrepresentation. Estoppel under these theories is an unusual remedy granted only in extraordinary circumstances and the landowner bears the burden of proving his entitlement to relief. Except for the characterization of the municipal act that induces reliance, all three theories share common elements of good faith action on the part of the landowner: 1) that he relies to his detriment, such as making substantial expenditures, 2) based upon an innocent belief that the use is permitted, and 3) that enforcement of the ordinance would result in hardship, ordinarily that the value of the expenditures would be lost.

*Vaughn v. Zoning Hearing Bd. of Twp. of Shaler,* 947 A.2d 218, 224–225 (Pa. Cmwlth.), *appeal denied,* 599 Pa. 713, 962 A.2d 1199 (2008) (quoting *Kreider,* 808 A.2d at 343 (citations and footnote omitted)).

In *Kreider,* the landowners sought to operate a campground without land development approval based on the doctrine of variance by estoppel. We rejected the landowners' estoppel claim based on several specific findings that the landowners acted in bad faith.

Here, as in *Kreider,* the ZBA specifically determined Lamar did not act in good faith. The ZBA stated: "Lamar has not established a vested right in Permit No. 07–08817 under the standards the Su-

preme Court established in *Petrosky* and has demonstrated due diligence only in its efforts to circumvent the explicit requirements of the ... Code." Concl. of Law No. 9. The ZBA determined that, in asserting its vested rights claim, Lamar relied almost exclusively on the "swap" arrangement with the City to support its contention that it exercised due diligence in attempting to comply with the law and acted in good faith throughout the proceedings. The ZBA responded to this argument, stating: "the purported 'swap' agreement is redolent of Lamar's efforts to avoid the Code's requirements." Concl. of Law No. 10. As explained above, the ZBA found Lamar presented no written documentation of a "swap" agreement and no legal authority that would justify it, even if similar "swaps" were previously accomplished. *Id.*

Of further note, the ZBA determined:

12. The issuance of Sign Permit No. 07–08817 resulted from the Zoning Administrator's determination that the addition of the 1098 sf LED Sign was a "minor amendment" to an approved project development plan. Although Sign Permit No. 07–08817 indicates an estimated cost of $5,000, Lamar's witnesses testified that the cost of the LED sign is approximately $3,500,000. The Code provides that any external alteration of a structure in the GT Districts, which exceeds $50,000 in costs, must be in accordance with a plan approved by the Planning Commission. Section 922.10.B. Under the Code, the LED sign was prohibited in the GT–B District. That fact, in and of itself, makes clear that the reintroduction [of] the LED Sign was not a "minor amendment" to the [Project Development Plan] for the [subject property], particularly where the "amendment" requested was for a feature which the Design Review Committee had identified as "unacceptable" for the building. Further, despite the estimate listed on the sign permit, the cost of the sign is well in excess of the $50,000 which required, at the very least, Planning Commission review of the change to the approved [Project Development Plan] for the [subject property]. The Zoning Administrator thus clearly erred in determining that the LED Sign constituted a "minor amendment" to the approved [Project Development Plan] for the [subject property].

13. The effort to characterize a 1098 sf LED Sign—the cost of which Lamar now estimates to be $3,500,000 and not the $5,000 identified in Sign Permit No. 07–08817—as a "minor amendment" to a project development plan is singularly disingenuous and indicative of a lack of good faith, even if the Zoning Administrator approved the change as a "minor amendment."

14. Lamar was, or should have been, aware that no City official had the authority to enter any agreement, written or otherwise, that ignored the requirements of the ... Code and bypassed the remedial safeguards and processes that the Code requires. The City Solicitor's letter, in fact, confirms that nothing in the Code permits a "swap" agreement.

15. For these reasons, Lamar did not exercise due diligence in attempting to comply with the Code and did not act in good faith throughout the proceedings.

Concls. of Law Nos. 12–15.

Additionally, the ZBA determined that testimony from Lamar's witnesses that the effects the LED sign would not be detrimental to the public health, safety and welfare were "self-serving at best." Concl. of Law No. 18.

In short, the ZBA's determinations that Lamar did not meet its burden of proving good faith and due diligence preclude La-

mar from entitlement to relief on vested rights or equitable estoppel grounds.

## F. Variances

As a final issue, Lamar contends it is entitled to variances for its LED and ticker signs. Lamar asserts that it established that it was entitled to a variance for use of the LED sign, which it concedes is not permitted in the GT–B district, as well variances for the size and height of the sign. Lamar also asserts it sought a dimensional variance for the ticker sign and, it argues, a more relaxed standard is employed to determine unnecessary hardship for a dimensional variance as opposed to a use variance. Lamar maintains that, because of the physical conditions of the subject property, there is no possibility it could be developed in strict conformity with the Code.

As to the requirements necessary to obtain a variance, the Code states (with emphasis added):

**922.09.E General Conditions for Approval**

No variance in the strict application of any provisions of this Zoning Code shall be granted by the [ZBA] unless it finds that all of the following conditions exist:

1. *That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property, and that the unnecessary hardship is due to the conditions, and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located;*

2. *That because of such physical circumstances or conditions, there is no possibility that the property can be de-*

*veloped in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property;*

3. *That such unnecessary hardship has not been created by the appellant;*

4. *That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and*

5. *That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue . . . .*

*The applicant shall have the burden of demonstrating that the proposal satisfies the applicable review criteria.*

Section 922.09.E of the Code.

 To show unnecessary hardship an applicant must prove that either: (1) the physical features of the property are such that it cannot be used for a permitted purpose; or (2) the property can be conformed for a permitted use only at a prohibitive expense; or (3) the property is valueless for any purpose permitted by the zoning ordinance. *Taliaferro.* The applicant must show the hardship is unique or peculiar to the property as distinguished from a hardship arising from the impact of zoning regulations on the entire district. *Id.* Mere evidence that the zoned use is less financially rewarding than the proposed use is insufficient to justify a variance. *Id.* Where a condition renders a property almost valueless without the grant of a variance, unnecessary hardship is established. *Id.; Soc'y Created to Reduce Urban Blight v. Zoning Bd. of Ad-*

*justment of City of Phila.*, 787 A.2d 1123 (Pa.Cmwlth.2001). Further, where zoning regulations prohibit any reasonable use of the property absent variance relief, the requisite hardship is proven. *Taliaferro.*

■ As to Lamar's variance request for its LED sign, the ZBA determined a use variance was required for this advertising sign because Section 919.02.A of the Code prohibits advertising signs in the GT–B district. No error is apparent in this initial determination. *See, e.g., 1700 Columbus Assocs. v. City of Phila., Zoning Bd. of Adjustment*, 976 A.2d 1257 (Pa. Cmwlth.2009) (relaxed hardship standard set forth in *Hertzberg v. Zoning Board of Adjustment of City of Pittsburgh*, 554 Pa. 249, 721 A.2d 43 (1998), inapplicable to request for variance from Philadelphia Zoning Code's billboard regulations because such variances are use rather than dimensional variances).

Further, no error is apparent in the ZBA's determination that Lamar did not meet its burden of proof to obtain a use variance. Specifically, in denying Lamar's variance request for the LED sign, the ZBA determined Lamar did not prove the requisite unnecessary hardship. Specifically, the ZBA determined the subject property is being used in conformity with the Code's requirements. As such, the ZBA stated Lamar could not prove there were unique physical circumstances relating to the subject property that would warrant relief from the Code's requirements to allow for the reasonable use of the subject property. Concl. of Law. No. 23.

The ZBA also determined it would be improper to grant Lamar a variance to allow a use that is prohibited on all other properties in the GT districts, which would provide an economic benefit to Lamar and the Authority that is not provided to any other landowner in those districts. Concl.

of Law. No. 24. In addition, the ZBA determined evidence that the LED sign might be occasionally used for public events or that the Authority's income from the sign might have an effect on public parking rates was not sufficient to justify the grant of a use variance. Concl. of Law No. 25.

■ Because the subject property is already being used for a permitted purpose and because the characteristics of the subject property are not such that it has no value with respect to a permitted use, the ZBA properly concluded Lamar did satisfy its burden of proving unnecessary hardship to justify the grant of a use variance. *See 1700 Columbus Assocs.* (where property used for private parking lot, the applicant did not show unnecessary hardship to justify a variance for a non-accessory advertising sign); *See Soc'y Created to Reduce Urban Blight (SCRUB) v. Zoning Bd. of Adjustment of City of Phila.*, 862 A.2d 745 (Pa.Cmwlth.2004) (where property used for waste paper sorting and bailing and for recycling of metal, glass and plastic products, the applicants did not show unnecessary hardship to justify a variance for a non-accessory advertising sign). Also, evidence that the LED sign would provide Lamar and the Authority an economic benefit, is not sufficient to establish hardship. *See, e.g., Wilson v. Plumstead Twp. Zoning Hearing Bd.*, 594 Pa. 416, 936 A.2d 1061 (2007) (mere evidence that zoned use is less financially rewarding than proposed use is insufficient to justify a variance). Therefore, the ZBA's denial of a use variance for the LED sign was appropriate.

As for the ticker sign, the ZBA determined, pursuant to Section 910.01.D.2.b of the Code, which permits electronic sign messages by conditional use in the GT–B district, the variance requested for the 1082.5 square foot ticker sign was a dimen-

sional variance from the Code's 300 square foot size limitation. *See* Section 910.01.-D.2.b.1 of the Code.

This Court consistently rejects requests for dimensional variances where proof of hardship is lacking. Where no hardship is shown, or where the asserted hardship amounted to a landowner's mere desire to increase profitability, the unnecessary hardship criterion required to obtain a variance was not satisfied even under the relaxed standard set forth by the Supreme Court in *Hertzberg v. Zoning Bd. of Adjustment of City of Pittsburgh,* 554 Pa. 249, 258–59, 721 A.2d 43, 47–48 (1998). *See, e.g., Twp. of Northampton v. Zoning Hearing Bd. of Northampton Twp.,* 969 A.2d 24 (Pa.Cmwlth.2009) (rejecting applicant's request for variance from ordinance's off-street parking requirements where no evidence of hardship presented even under relaxed *Hertzberg* standard and evidence revealed applicant could use property in a manner consistent with ordinance requirements); *In re Boyer,* 960 A.2d 179 (Pa.Cmwlth.2008) (rejecting applicant's requests for dimensional variances from ordinance's steep slope and setback requirements in order to construct in-ground pool where no evidence of hardship presented even under relaxed *Hertzberg* standard); *Twp. of E. Caln v. Zoning Hearing Bd. of E. Caln Twp.,* 915 A.2d 1249 (Pa.Cmwlth.2007) (rejecting request for dimensional variance to increase height of cell tower because "gap in coverage" in emergency service does not satisfy unnecessary hardship requirement); *Se. Chester County Refuse Auth. v. Zoning Hearing Bd. of London Grove Twp.,* 898 A.2d 680 (Pa.Cmwlth.2006) (rejecting request for dimensional variance where evidence indicated applicant could continue to operate at a profit without variance relief; no hardship shown); *One Meridian Partners, LLP v. Zoning Board of Adjustment of City of Phila.,* 867 A.2d 706 (Pa.Cmwlth.2005) (re-

jecting request for dimensional variance from floor area ratio and height requirements where asserted hardship was essentially financial in nature); *Great Valley Sch. Dist. v. Zoning Hearing Bd. of E. Whiteland Twp.,* 863 A.2d 74 (Pa.Cmwlth. 2004) (rejecting request for dimensional variance to construct light poles for high school stadium that deviated from ordinance's height restriction where no hardship shown).

Analogous is our decision in *One Meridian Partners.* There, we rejected a developer's request for dimensional variances in order to construct a 50–story, luxury, high-rise condominium tower that would deviate substantially from the permissible floor area ratio and height requirements in the Philadelphia Zoning Code. Among other things, the developer sought a dimensional variance to increase the permissible floor area ratio by 300% as well as an increase in nearly 100 feet for the permissible height of the building. The developer claimed he could not construct the high-rise in accordance with the Philadelphia Zoning Code's dimensional requirements because he could not build enough condominiums to make the project financially viable. We held the asserted hardship was insufficient to justify the grant of the dimensional variances because it amounted to a claim that constructing a dimensionally complaint building would result in financial harm to the developer. We concluded our discussion by restating our prior holding that:

> [W]hile *Hertzberg* eased the requirements ... it did not make dimensional requirements ... "free-fire zones" for which variances could be granted when the party seeking the variance merely articulated a reason that it would be financially "hurt" if it could not do what it wanted to do with the property.... If that were the case, dimensional re-

quirements would be meaningless—at best, rules of thumb—and the planning efforts that local governments go through in setting them to have light, area, and density buffers would be a waste of time.

*Id.* at 710–11 (quoting *Soc'y Created to Reduce Urban Blight v. Zoning Bd. of Adjustment,* 771 A.2d 874, 878 (Pa. Cmwlth.2001)).

 Similar to the dimensional variance requested by the developer in *One Meridian Partners,* here Lamar's dimensional variance request contemplated more than a 350% increase from the 300 square foot size limitation on electronic sign messages. Concl. of Law No. 33. According to the ZBA, the only justifications Lamar offered for this substantial deviation were its "self-interested opinion that the [t]icker [s]ign would be a community benefit and the assertion that the income from the sign would benefit the Parking Authority." *Id.*

Clearly, this alleged hardship is insufficient to satisfy the requisite hardship criterion even under the relaxed *Hertzberg* standard. *One Meridian Partners.* As such, no error is apparent in the ZBA's denial of a dimensional variance for Lamar's proposed ticker sign.

For all the foregoing reasons, we affirm.

Judge McGINLEY did not participate in the decision in this case.

## ORDER

**AND NOW,** this 23rd day of June, 2010, the order of the Court of Common Pleas of Allegheny County is **AFFIRMED.**