5542 Penn LP                                              :
                          v.                              :
                                                          :
Zoning Board of Adjustment of the                         :
City of Pittsburgh, City of Pittsburgh,                   :
Bloomfield-Garfield Corp., Joanne                         :
Tzortzis, The Friendship Community                        :
Group, Doug Cruze and The Highland                        :
Park Community Council                                    :
                                                          :
Appeal of: Bloomfield-Garfield Corp.,                     :
Joanne Tzortzis, The Friendship                           :
Community Group, Doug Cruze and                           :   No. 2227 C.D. 2015
The Highland Park Community Council :   Argued: November 15, 2016


BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE JULIA K. HEARTHWAY, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                               FILED: December 20, 2016


         Bloomfield-Garfield Corporation, Joanne Tzortzis, The Friendship
Community Group, Doug Cruze and the Highland Park Community Council
(collectively, Appellants) appeal from the Allegheny County Common Pleas Court's
(trial court) October 8, 2015 order reversing the City of Pittsburgh (City) Zoning
Board of Adjustment's (ZBA) October 16, 2014 decision denying 5542 Penn LP's
(Applicant) application for a special exception and variances.[1]  The issue before this
Court is whether the trial court erred by impermissibly substituting its own factual
and legal determinations for those of the ZBA, and by failing to apply the controlling
standard of review.[2]

---

[1] The ZBA also submitted a brief to this Court and participated in this appeal.

[2] In their brief, Appellants raised four sub-issues in their Statement of Questions Presented:

Applicant owns property located at 5542, 5536 and 5534 Penn Avenue, Pittsburgh, Pennsylvania (Property), at its intersection with Negley Avenue, in a Local Neighborhood Commercial (LNC) Zoning District. The Property is comprised of four separate adjacent parcels (collectively, Parcels).

Parcel A, which is approximately 4,198.21 square feet, has a street address of 5542 Penn Avenue and is bounded on the east by Negley Avenue. There is a structurally-unsound, one-story building on Parcel A which was constructed along the Property's boundary lines. Accordingly, there are zero-foot front, rear, and side yard setbacks.

---

A. Was it prejudicial error for the [trial] court to disregard the ZBA's findings of fact and conclusions of law regarding abandonment of a setback nonconformity and substitute its own view for that of the ZBA?

. . . .

B. Did the [trial] court rely upon an inapplicable section of the [Pittsburgh Zoning Code (C]ode[)] and improperly hold that [Applicant] did not need to comply with [Local Neighborhood Commercial Zoning] District standards []?

. . . .

C. Was it an error of law for the [trial] court to reject the ZBA's conclusion that [Applicant] failed to establish its entitlement to relief from multiple . . . [C]ode standards in the form of variances and/or special exceptions?

. . . .

D. Was the [trial] court bound by the ZBA's determination that no special exception could be awarded due to the evidence that the proposed development would result in harm caused by the unique traffic conditions fostered by the proposed development?

Appellants' Br. at 2. These sub-issues are subsumed within the issue of whether the trial court erred by impermissibly substituting its own factual and legal determinations for those of the ZBA, and by failing to apply the controlling standard of review.

Parcel B, located adjacent to Parcel A, is approximately 4,998 square feet, and has no street number. An asphalt parking lot and a cinderblock garage currently occupy Parcel B. Parcel B likewise maintains zero-foot front, side and rear yard setbacks. Parcel C, located next to Parcel B, is approximately 2,499 square feet, and has a street address of 5536 Penn Avenue. Parcel C contains a two-story attached structure with a zero-foot front, side and rear yard setback.

Parcel D, located next to Parcel C, is approximately 2,499 square feet, and has a street address of 5534 Penn Avenue. Parcel D contains a two-story, attached structure with a zero-foot front and side yard setback, and a 5 foot, 9 inch rear yard setback. There is a substantial grade change downward from Parcel D to Parcel A. Hugus Place, a 20-foot wide alley with a 16-foot cartway, borders the Property to the south and, runs parallel to Penn Avenue. It is the dividing line between the LNC Zoning District and the Three-Unit Residential, Moderate Density (R3-M) Zoning District to the south.

Applicant proposes to construct a one-story, 6,787 square foot structure containing an AutoZone retail auto parts store (Proposed Building). The proposed building will occupy Parcel A and a portion of Parcel B, and will face west towards the planned parking lots occupying the remaining parcels. Applicant desires to demolish most of the existing building on Parcel A, but leave the wall along Hugus Place, and possibly, the wall along Negley Avenue.[3] Applicant would also like to

---

[3] Pennsylvania Rule of Appellate Procedure (Rule) 2173 requires a reproduced record to "be numbered . . . in Arabic figures . . . followed in the reproduced record by a small a . . . , and followed in any supplemental reproduced record by a small b . . . ." Pa.R.A.P. 2173. For clarification, we note that Appellants failed to comply with Rule 2173. The Appendices in Appellants' brief are numbered in Arabic figures followed by a small a, and the reproduced record is numbered in Arabic figures followed by a small b. Thus, references to specific pages in the reproduced record shall be followed by a small b.

The record is unclear as to whether one or two walls will remain after Parcel A's building is partially demolished. At the July 17, 2014 ZBA hearing, Applicant's attorney Jonathan Kamin (Kamin) explained: "The proposal is to demolish the existing structure with the exception of the

demolish the existing parking lot and buildings on Parcels C and D. Applicant's plans further include extending the existing Parcel A wall along Hugus Place along the rear of Parcel B to create a 72-foot-long side wall for the proposed building. An opposite 72-foot wall will be constructed to run along Penn Avenue, set approximately 5 feet back from the Property line, and occupy Parcel A and a portion of Parcel B. The Proposed Building's 100-foot-long rear wall would face Negley Avenue. Because a level pad must be constructed for the Property, Applicant's site plan proposes to level the grade, resulting in the Proposed Building being approximately 8 feet higher than the current grade at Negley Avenue between Penn Avenue and Hugus Place.

Applicant's proposed 16-space parking lot would cover approximately 6,340 square feet of land, and is equivalent to 92% of the square footage of the Proposed Building. The parking lot would have approximately 70.5 feet of frontage on both Penn Avenue and Hugus Place, and would be accessed by entrances from both. The parking lot entrance/exit along Hugus Place would be located within 60 feet of a residential parking area across Hugus Place. Although there was no loading dock identified in the proposed site plan, the plan depicted a dumpster to be located in the southwest corner of the parking lot, within 26 feet of residentially-zoned property.

---

wall that runs along the corner of [Hugus] Place and Negley [Avenue]. That wall is to be left intact." Reproduced Record (R.R.) at 26b. He further stated: "The wall that runs along the alley will be left. The rest of the structure will be demolished." *Id*. ZBA Chairwoman Alice Mitinger (Mitinger) sought further clarification: "I just need to orient. The intent is to demolish the rest of the structure, with the exception of what would be the rear wall along [Hugus] Place?" *Id*. Kamin replied: "That's correct." *Id*. In response, Mitinger asked: "Okay. But not the Negley [Avenue] wall side or not Penn Avenue? All of that is to be demolished?" *Id*. Kamin responded: "That's Correct." *Id*. Later, Mark Mox (Mox), the site engineer who prepared the plans, was asked: "Of the [building on Parcel A], everything there will be demolished except for the wall running along [Hugus] Place; correct?" R.R. at 70b. Mox replied: "And also a portion along South Negley." *Id*. Mox was then asked: "What portion along South Negley will not be demolished?" *Id*. He replied: "That will be determined by the architect." *Id*.

On July 17, 2014, the ZBA held a hearing to consider whether special exceptions should be granted pursuant to Residential Compatibility Standards, as set forth in Sections 916.09,[4] 916.02.A.8(a) and 916.02.A[5] of the Pittsburgh Zoning Code (Code), and whether variances should be granted from Sections 904.02.B.2,[6]

---

[4] Section 916.09 of Code states:

> The [ZBA] may approve a Special Exception according to the provisions of Sec[tion] 922.07 [of the Code] to waive one (1) or more of the Residential Compatibility Standards imposed by this Chapter, subject to the following standards:
>
> A. The [ZBA] shall determine that the waiver will not create detrimental impacts on the surrounding properties, taking into consideration the physical relationship of the proposed use and structure to surrounding residential uses and structures;
>
> B. The [ZBA] shall impose alternative methods which will cause the development to comply with the purpose of the Residential Compatibility Standards;
>
> C. Building height restrictions found in this chapter may be waived only if there is a taller intervening structure between the proposed structure and the adjacent residential zoning district, in which case the height shall be limited to the height of the intervening structure; and
>
> D. Setbacks for accessory uses, required by Sec[tion] 912.04 [of the Code], shall be waived only if additional screening is required by the [ZBA], beyond that required by Chapter 918 [of the Code], such that the items are completely screened from view from abutting residential properties at grade level of the residential properties.

[5] Sections 916.02.A.8(a) and 916.02.A of the Code pertain to building setbacks.

[6] Section 904.02.B.2 of the Code prohibits accessory uses in an LNC Zoning District from exceeding 25% of the gross floor area of the primary use.

914.09.A.2,[7] and 922.04.E.3.a-e[8] of the Code.

Applicant presented its general partner Brian Gumberg and the engineer who prepared Applicant's site plan Mark Mox's (Mox) testimony. Mox testified that the Property's proposed grade change presented design challenges in planning a building that would comply with the Code and the Americans with Disabilities Act of 1990 (ADA).[9] Mox stated that, in order to satisfy the ADA's requirements, "the site must connect to the existing sidewalk on Penn Avenue; must furnish handicapped[-]accessible parking; and must provide a handicapped[-]accessible parking route from the parking lot to the building." Appellants' Br., Appendices (App.) at 10a (Finding of Fact (FOF) No. 32). Mox also explained that to be ADA-compliant, the grade of the route from the proposed parking lot may not exceed 2%, and that "restrictions on the permitted grade required the [P]roposed [Building] to be constructed with a floor elevation height that maintains the permitted grade from the parking lot." Id. (FOF No. 33). Mox further represented that the existing grades limited the structure's location.

Appellants offered licensed architect and Evolve Environment Architecture's partner Marc Mondor, and architect and Carnegie Mellon University's School of Architecture faculty member Stefani Danes' (Danes) testimony. Danes presented a massing sketch of the Proposed Building using Applicant's dimensions, and explained how Applicant could position a compliant building on the Property. "[Danes] did not attempt to detail specific articulation and façade treatments for the

---

[7] It appears the ZBA erroneously referenced Section 914.09.A.2 of the Code in its decision, rather than Section 914.09.A.1 of the Code, which pertains to visibility of off-street parking areas from public streets.

[8] Sections 922.04.E.3.a-e of the Code pertain to required building frontage, ground floor transparency, required street-level doorways on street-fronting building facades, prohibited building designs with long, flat facades, and side parking areas, respectively.

[9] 42 U.S.C. §§ 12101-12213.

6

building as required under Section 922 [of the Code], but testified that no architectural or physical reason prevented compliance with those standards." App. at 11a (FOF No. 41). "[Danes] did not address [the] parking lot design for the site or ADA accessibility[,] but opined that nothing required the precise building and parking lot layout presented and that other options existed for meeting [the City's] design and accessibility requirements." App. at 11a (FOF No. 42).

Appellants also presented traffic engineer Michael Mudry's (Mudry) testimony. Mudry testified that Applicant's proposed store would generate abnormal traffic patterns which would exacerbate existing traffic issues. According to Mudry, a median barrier along Penn Avenue between Negley and Stratford Avenues would cause 75% of the vehicular traffic to use Hugus Place alley as an arrival route, and 50% of the traffic to use it as a departure route. Mudry further opined that the proposed plans and existing traffic turn restrictions would create circuitous traffic routing that would negatively affect the neighboring community. He further described traffic conflicts that could arise based on projected traffic volumes.

Neighbor Joanne Tzortzis, owner of two residential buildings bordering Hugus Place, testified that the only means of accessing the parking area to her buildings was by Hugus Place. She recounted stories of delivery trucks blocking Hugus Place, and expressed concerns about additional delivery trucks and traffic that could result from the proposed project. Richard Swartz (Swartz), Executive Director of Bloomfield-Garfield Corporation, a community advocacy and planning and development organization, also expressed worries pertaining to parking and traffic. Swartz also raised trepidations regarding residential compatibility issues and transparency requirements for Penn and Negley Avenue storefronts.

On October 16, 2014, the ZBA issued its decision denying Applicant's application. The ZBA explained:

7

Code Chapter 916 sets forth Residential Compatibility Standards which are designed to protect residential properties and neighborhoods from the adverse impacts sometimes associated with adjacent non-residential development and uses. The [ZBA] may grant a waiver of [R]esidential [C]ompatibility [S]tandards as a special exception, in accordance with the general review criteria for a special exception in Code Section 922.07.D, including consideration of detrimental visual impacts relating to the size and bulk of the proposed development in the context of the surrounding built environment, transportation impacts, operational impacts and impacts on future and potential development of parcels in the vicinity of the proposed site.

. . . .

[] Code Section 922.04.E.3 sets forth specific site plan review criteria for all properties zoned LNC, including those for a) a build-to line of 65% building frontage on the primary frontage and 50% on the secondary frontage for a corner lot; b) ground floor transparency between 3 to 8 feet above the walkway grade for no less than 60% of the building façade; c) a prominent and highly visible street level doorway or entrance for all façades which front a street; and d) design that considers siting, massing proportions, scale, façade treatment in relation to surrounding architectural context.

. . . .

[] Code Chapter 921 addresses the protections and limitations for maintaining nonconforming uses and structures. Code Section 921.02.B.2 describes evidence of abandonment of a nonconforming use, including removal of a building or a physical change in the building or structure in a way that clearly indicates a change in its use or activity.

App. at 13a (Conclusions of Law (COL) Nos. 3, 5, 7).

The ZBA continued:

[] Razing or demolishing a nonconforming use or structure constitutes abandonment of the nonconformity.

[] Applicant indicated that it intends to retain the wall of the current nonconforming structure along Hugus Place and

8

that it intends to relocate the existing parking lot. The Applicant's witnesses testified, however, that the current parking lot would be demolished and that the building would be a 'new build.'

[] The demolition of substantially all of the existing building on Parcel A and the demolition of the parking [l]ot on Parcel B constitutes abandonment of the nonconforming aspects of the structures and uses on those lots.

App. at 13a (COL Nos. 9, 10, 11) (citations omitted). The ZBA concluded that Applicant did not meet its burden for the grant of special exceptions or variances.

Applicant appealed from the ZBA's decision to the trial court. The trial court did not take new evidence. On October 8, 2015, based on the ZBA's record, the trial court reversed the ZBA's decision because the ZBA "incorrectly concluded that no nonconforming protections exist on the Property[,]" and that Applicant's "proposed redevelopment of the Property would continue the pre-existing legal nonconforming setback along Hugus Place of zero-feet and is no more nonconforming than what is currently on the Property." App. at 4a. The trial court addressed only the setback issue and did not discuss any of the ZBA's other reasons for denying the application. Appellants appealed to this Court.[10]

Appellants first argue that the trial court erred by impermissibly substituting its own factual and legal determinations for those of the ZBA, and by failing to apply the controlling standard of review to find that the Applicant was permitted to proceed with its plan as of right.

Initially, we acknowledge that

a basic purpose of zoning is to promote orderly development; non-conforming uses are inconsistent with that goal and are tolerated to avoid imposing hardship and to avoid constitutional problems. **The policy of the law,**

---

[10] Where "the parties presented no additional evidence after the [ZBA's] decision, our review is limited to determining whether the [ZBA] committed an abuse of discretion or an error of law." *Dunn v. Middletown Twp. Zoning Hearing Bd.*, 143 A.3d 494, 497 n.1 (Pa. Cmwlth. 2016).

9

**however, is to restrict such uses closely and to strictly construe ordinance provisions providing for their continuance**, so that they may be reduced to conformity as speedily as is compatible with the law and the constitution.

*S. Coventry Twp. Bd. of Supervisors v. Zoning Hearing Bd.*, 732 A.2d 12, 15 (Pa. Cmwlth. 1999) (emphasis added) (citing *Hanna v. Bd. of Adjustment of the Borough of Forest Hills*, 183 A.2d 539 (Pa. 1962)).

Specifically, Appellants contend that the trial court erred when it reversed the ZBA, which properly relied on *Keebler v. Zoning Board of Adjustment of the City of Pittsburgh*, 998 A.2d 670 (Pa. Cmwlth. 2010) for the rule that "[r]azing or demolishing a nonconforming use or structure constitutes abandonment of the nonconformity." App. at 13a (COL No. 9). Notably, the trial court held that the ZBA erred because, in the trial court's view, *Keebler* stands for the proposition that the right to reconstruct a structure is extinguished **only** where the **entire** structure has been razed. The trial court reasoned that the retention of a part of an existing nonconforming structure permits a nonconforming reconstruction.

In *Keebler*, this Court considered whether the ZBA properly granted a use variance to construct condominiums after the existing building was demolished. The property owner sought a special exception to change from one nonconforming use to another.

> In its decision . . . [t]he [ZBA] noted, however, that prior to being razed, the [p]roperty was a nonconforming use and that upon razing of the building, the [p]roperty abandoned its status as a nonconforming use . . . . [T]he [ZBA] reasoned that it could permit the grant of the proposed use on a different legal theory than that which was initially requested by [the property owner].

*Id*. at 672. Thus, the ZBA granted the property owner a use variance instead. The trial court affirmed the ZBA's decision. This Court vacated the trial court's order, and remanded for the ZBA to afford the objectors an opportunity to address the

10

property owner's right to the use variance. This Court also disagreed with the property owner's contention that it was entitled to a special exception, thereby agreeing with the ZBA's conclusion that the property owner had abandoned the nonconforming use. The Court held:

> [The property owner] claims that it did not abandon, nor did it intend to abandon the nonconforming use. **By razing the building, however, [the property owner] has abandoned its status as a nonconforming use as defined in [Section] 921.02.B.2 [of the Code] inasmuch as it has physically changed the structure of the building by demolishing it[,] which clearly indicates a change in use.** Moreover, 'while proof of intent to relinquish the use voluntarily is necessary in an abandonment case, **such proof is not necessary where the structure is destroyed because the right to reconstruct a structure is extinguished by operation of law.'** *Korngold v. Zoning B[d.] of Adjustment of the City of Phila*[.], . . . 606 A.2d 1276, 1280 [(Pa. Cmwlth. 1992).]

*Keebler*, 998 A.2d at 674 (emphasis added). This Court rejected the property owner's argument that "because the foundation remains, there has been no abandonment[,]" explaining that "inasmuch as there is no dispute that the structure itself has been demolished and where the structure has been destroyed, the right to reconstruct the structure is extinguished by operation of law." *Id*. at n.3.

The trial court herein interpreted *Keebler* to hold that a right to reconstruct a nonconforming structure is extinguished **only** where the entire existing nonconforming structure is completely destroyed. Further, the trial court relied on *Money v. Zoning Hearing Board of Haverford Township*, 755 A.2d 732 (Pa. Cmwlth. 2000), wherein a landowner sought a building permit to replace a nonconforming use with another nonconforming use. Specifically, the landowner sought to replace a deteriorated nonconforming garage/chicken coop with a smaller nonconforming garage. The proposed garage exceeded the zoning ordinance's size limitations, but

11

the landowner contended that he was permitted to build the garage because it was a replacement of a nonconforming structure and a continuation of a nonconforming use.

The zoning hearing board denied the application and the common pleas court affirmed. On appeal, this Court reversed, explaining:

> 'A lawful nonconforming use establishes in the property owner a vested property right which cannot be abrogated or destroyed unless it is a nuisance, it is abandoned or it is extinguished by eminent domain.' *Keystone Outdoor Adver*[.] *v. Dep*[']*t of Transp*[.], 687 A.2d 47, 51 (Pa. Cmwlth. 1996)[.] Here, the sole issue is whether [the l]andowner abandoned the nonconforming use. The [t]ownship contends that [the l]andowner abandoned the nonconforming use by allowing the old garage/chicken coop to fall into a state of disrepair. The [t]ownship argues that the dilapidated condition of the old garage/chicken coop prevented the structure from being used as a garage for a substantial period of time and supports the conclusion that the use was abandoned.

> As the party claiming the abandonment, the [t]ownship bears the burden of proving that [the l]andowner abandoned the nonconforming use. To sustain its burden of proof, the [t]ownship must show that (1) [the l]andowner intended to abandon the nonconforming use and (2) [the l]andowner actually abandoned the use consonant with his intention. Here, the [t]ownship has failed to meet its burden of proving either [the l]andowner's intent to abandon or actual abandonment.

> With respect to [the l]andowner's intent to abandon the use, we observe that a landowner's failure to use property for a period of time designated by a zoning ordinance is evidence of the intention to abandon.

*Money*, 755 A.2d at 736-37 (citations and footnotes omitted). The *Money* Court expounded:

> [W]e acknowledge that, even where a landowner has used the building within the prior designated time period,

structural alterations to a building that are inconsistent with continuance of the nonconforming use may establish both intent to abandon and actual abandonment. Indeed, this was the basis of our conclusion in *Tantlinger* [*v. Zoning Hearing Board of South Union Township*, 519 A.2d 1071 (Pa. Cmwlth. 1987)]. In that case, the landowners replaced a nonconforming mobile home with a modular home, which was a conforming use, arguing, *inter alia*, entitlement to do so as a continuation of a nonconforming use. Rejecting this argument, we explained[:] 'Clearly, the complete removal of a nonconforming structure, and **replacement of it with a different type of structure**, is an abandonment of the nonconforming use thus eliminated, and is inconsistent with the concept of continuing it.' *Tantlinger*, 519 A.2d at 1074 (emphasis added). Thus, contrary to the trial court's interpretation, *Tantlinger* does not prohibit the replacement of 'one nonconforming structure with another nonconforming structure,' (*see* trial court op. at 4); rather, it prohibits only the replacement of a nonconforming structure with a different type of structure.

Here, [the l]andowner proposes to replace the old garage/chicken coop with a **similar** structure - a garage. Because both structures are nonconforming as to area, it cannot be said that [the l]andowner is abandoning the nonconforming use by building the new garage. Unlike the situation in *Tantlinger*, [the l]andowner's proposed replacement garage is a continuation, not an abandonment, of a nonconforming use.

Courts have permitted landowners to demolish nonconforming structures and replace them with new nonconforming structures. For example, in *Amoco Oil Co. v. Ross Township Zoning Hearing Board*, . . . 426 A.2d 728 ([Pa. Cmwlth.] 1981), we held that the razing of a building that is a nonconforming use does not eliminate the landowner's right to continue that use by erection of another building also nonconforming as to use. Similarly, in *Trettel v. Zoning Hearing Board of Harrison Township*, . . . . 658 A.2d 741 ([Pa.] 1995), our [S]upreme [C]ourt granted a country club permission to demolish its old, dilapidated nonconforming maintenance shed and replace it with a new one on exactly the same site.

13

> We recognize that, where a building has become so dilapidated that complete reconstruction is necessary, a *zoning ordinance **may** bar reconstruction in the interest of the public health, safety, morals or general welfare. However, such a restriction 'must be specifically set forth in the ordinance and, absent such regulations, a landowner seeking to continue a valid nonconforming use must be permitted to do so.' Zeiders v. Zoning Hearing B[d.] of Adjustment of W[.] Hanover T[wp.], . . . 397 A.2d 20, 21 ([Pa.] Cmwlth.] 1979).* Thus, in *Zeiders*, because no ordinance prohibited demolition and rebuilding, this [C]ourt permitted a nursery business, as a continuation of a nonconforming use, to remove and rebuild a shade house that was nonconforming as to setback requirements.

*Money*, 755 A.2d at 737-38 (italic emphasis added; citations omitted).

In the instant action, the trial court considered the application in the context of Section 921.03 of the Code, which states:

> A nonconforming structure, including a nonconforming sign, which has a valid Certificate of Occupancy and lawfully occupies a site on the date that it becomes nonconforming that does not conform with the site development standards of the underlying zoning district or any other development standards of this Code may be used and **maintained**, subject to the standards and limitations of this section.

Code § 921.03 (emphasis added). In particular, the trial court applied Section 921.03.A.1 of the Code, pertaining to the **maintenance, remodeling and repair** of a nonconforming structure which provides: "**Maintenance, remodeling and repair of a nonconforming structure shall be permitted without a variance and without special exception approval, provided that such maintenance, remodeling or repair does not increase the degree of nonconformity.**" Code § 921.03.A.1 (emphasis added).

Appellants dispute that Section 921.03.A.1 of the Code is applicable and, in contrast, contend that Section 921.03.D.1 of the Code which pertains to

14

**enlargement, expansion or extension** of nonconforming structures applies. Section 921.03.D.1 of the Code states:

> A nonconforming structure may be enlarged, expanded or extended, in compliance with all applicable regulations of this Code, unless the enlargement, expansion or extension has the effect of increasing the degree of nonconformity or making a use or structure nonconforming in any other respect, subject to any applicable requirements of Sec[tion] 922.02 [of the Code].

Code § 921.03.D.1. We agree with Appellants that Section 921.03.A.1 of the Code is inapplicable to this matter. Further, we hold that Sections 921.03.C.3 **and/or** 921.03.D.1 of the Code are applicable.

> Section 921.03.C.3 of the Code states:

> In the event of arson or **other willful destruction**, **reconstruction of nonconforming structures shall be prohibited if such casualty is traceable to the owner** or his/her agent. Such instances shall **result in forfeiture of the nonconforming status**, and must subsequently be brought within all the prevailing restrictions applied to the surrounding district.

Code § 921.03.C.3 (emphasis added).

Here, the Property consists of four separate parcels. According to the proposed plan, the vast majority of the existing nonconforming structure on Parcel A will be demolished, rather than "enlarge[d or] expan[ded.]" Code § 921.03.D.1. Only the wall along Hugus Place, and possibly a portion of the wall along Negley Avenue, will remain. In addition, the leveling of the downward grade will result in an 8-foot increase in the height of Parcel A at Negley Avenue between Penn Avenue and Hugus Place, along the zero-foot setback that Applicant seeks to maintain. Thus, presumably, only the portion of the remaining wall or walls above the new parking lot height would be visible. Further, Parcels C and D each contain nonconforming two-story structures without front and side yard setbacks. Parcel C lacks a rear-yard

15

setback.  Parcel D contains a 5 foot, 9 inch rear-yard setback.  Applicant plans to raze the structures on Parcels C and D, and the garage and existing parking lot on Parcel B.  These nonconforming structures are not being enlarged or expanded pursuant to Section 921.03.D.1 of the Code.  Instead, they are being willfully destroyed, and the Proposed Building would be constructed on Parcel A and part of Parcel B using the above-ground portion of one or two existing walls, and a parking lot that would bury most of the subject parcels.  Thus, as "specifically set forth in" Section 921.03.C.3 of the Code, the nonconforming status for each of those Parcels would be extinguished and a structure, including a parking lot subsequently constructed on those Parcels would be required to comply with the Code.  *Money*, 755 A.2d at 738 (quoting *Zeiders*, 397 A.2d at 21).

Even if the nonconforming structures were deemed to be "enlarge[d or] expan[ded]," rather than destroyed, Section 921.03.D.1 of the Code would require Applicant to adhere to all applicable Code regulations.  Code § 921.03.D.1.  This Court has explained:

> A special exception is not an exception to a zoning restriction, but a use that is expressly permitted.
>
> > An exception in a zoning ordinance is one allowable where facts and conditions detailed in the ordinance, as those upon which an exception may be permitted, are found to exist.  Thus, an exception has its origin in the zoning ordinance itself.  It relates only to such situations as are expressly provided for and enunciated by the terms of the ordinance.  *The rules that determine the grant or refusal of the exception are enumerated in the ordinance itself.*  The function of the [ZBA] when an application for an exception is made is to determine that such specific facts, circumstances and conditions exist which comply with the standards of the ordinance and merit the granting of the exception.

16

*Broussard v. Zoning Bd. of Adjustment of City of Pittsburgh*, 831 A.2d 764, 769 (Pa. Cmwlth. 2003), *aff'd*, 907 A.2d 494 (Pa. 2006) (citation omitted) (quoting *Kotzin v. Plymouth Twp. Zoning Bd. of Adjustment*, 149 A.2d 116, 117-18 (Pa. 1959)) (quotation marks omitted).

> A variance, like a special exception, is issued by a zoning hearing board; however, unlike a special exception, a variance is not provided for in the zoning ordinance, but is permission to deviate from the ordinance in either the dimensions of the improvements made to the land or in the use of the land. A variance is the proper relief where an unnecessary hardship attends the property; a variance cannot provide relief where a hardship afflicts the property holder's desired use of the land and not the land itself. Although zoning ordinances are to be liberally construed to allow for the broadest possible use of the land, the applicant seeking a variance bears a heavy burden. The reasons for granting a variance must be substantial, serious, and compelling.

*Nowicki v. Zoning Hearing Bd. of Borough of Monaca*, 91 A.3d 287, 291 (Pa. Cmwlth. 2014) (citations omitted). "A variance applicant must show that unnecessary hardship will result if a variance is denied and that the proposed use will not be contrary to the public interest." *Hertzberg v. Zoning Bd. of Adjustment of City of Pittsburgh*, 721 A.2d 43, 47 (Pa. 1998).

> [I]n determining whether unnecessary hardship has been established, courts should examine whether the variance sought is use or dimensional. To justify the grant of a dimensional variance, courts may consider multiple factors, including the economic detriment to the applicant if the variance was denied, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood.

*Id.* at 50. However,

> while *Hertzberg* eased the requirements for granting a variance for dimensional requirements, it did not make

17

dimensional requirements . . . 'free-fire zones' for which variances could be granted when the party seeking the variance merely articulated a reason that it would be financially 'hurt' if it could not do what it wanted to do with the property, even if the property was already being occupied by another use. If that were the case, dimensional requirements would be meaningless - at best, rules of thumb - and the planning efforts that local governments go through in setting them to have light, area (side yards) and density (area) buffers would be a waste of time. Moreover, adjoining property owners could never depend on the implicit mutual covenants that placing dimensional restrictions on all property would only be varied when there were compelling reasons that not to do so would create a severe unnecessary hardship.

*Soc'y Created to Reduce Urban Blight v. Zoning Bd. of Adjustment of City of Phila.*, 771 A.2d 874, 877-78 (Pa. Cmwlth. 2001).

[Accordingly], this Court consistently rejects requests for dimensional variances where proof of hardship is lacking. Where no hardship is shown, or where the asserted hardship amounts to a landowner's desire to increase profitability or maximize development potential, the unnecessary hardship criterion required to obtain a variance is not satisfied even under the relaxed standard set forth in *Hertzberg*. *See, e.g., Singer v. Zoning Bd. of Adjustment of City of Phila.*, 29 A.3d 144 (Pa. Cmwlth. 2011) (rejecting applicant's request for dimensional variances from [z]oning [c]ode's parking, floor area ratio and loading dock requirements where asserted hardship amounted to applicant's desire to maximize development potential of property); *Lamar Advantage GP Co. v. Zoning Bd. of Adjustment of City of Pittsburgh*, 997 A.2d 423 (Pa. Cmwlth. 2010) (rejecting applicant's request for dimensional variance for proposed sign where only asserted hardship involved alleged benefit to community and increase in income); *Twp. of Northampton v. Zoning Hearing Bd. of Northampton Twp.*, 969 A.2d 24 (Pa. Cmwlth. 2009) (rejecting applicant's request for variance from ordinance's off-street parking requirements where no evidence of hardship presented even under relaxed *Hertzberg* standard and evidence revealed applicant could use property in a manner consistent with ordinance requirements); *In re Boyer*, 960 A.2d 179 (Pa.

18

Cmwlth. 2008) (rejecting applicant's requests for dimensional variances from ordinance's steep slope and setback requirements in order to construct in-ground pool where no evidence of hardship presented even under relaxed *Hertzberg* standard); *One Meridian Partners, LLP v. Zoning Bd. of Adjustment of City of Phila.*, 867 A.2d 706 (Pa. Cmwlth. 2005) (rejecting request for dimensional variance from floor area ratio and height requirements where asserted hardship was essentially financial in nature); *Yeager v. Zoning Hearing B*[*d.*] *of City of Allentown*, 779 A.2d 595 (Pa. Cmwlth. 2001) (rejecting applicant's request for dimensional variances from ordinance's setback and clear sight triangle requirements where only hardship amounted to applicant's desire to construct a building for its new car dealership that complied with specifications required by vehicle manufacturer).

*Soc'y Hill Civic Ass'n v. Phila. Zoning Bd. of Adjustment*, 42 A.3d 1178, 1187 (Pa. Cmwlth. 2012). An applicant has the burden to demonstrate that it is entitled to a special exemption or variance. *See Camp Ramah in the Poconos, Inc. v. Zoning Hearing Bd. of Worcester Twp.*, 743 A.2d 1019 (Pa. Cmwlth. 2000).

With respect to Applicant's special exception requests, Section 922.07.D.1 of the Code provides:

The [ZBA] shall approve Special Exceptions only if (1) the proposed use is determined to comply with all applicable requirements of this Code and with adopted plans and policies of the City and (2) the following general criteria are met:

(a) That the development will not create detrimental *visual* impacts, such that the size and *visual* bulk of the proposed development is determined to create an incompatible relationship with the surrounding built environment, public streets and open spaces and land use patterns;

(b) **That the development will not create detrimental transportation impacts, such that the proposed development is determined to adversely affect the safety and convenience of residential**

19

**neighborhoods or of vehicular and pedestrian circulation in the vicinity of the subject tract**;

(c) That the development will not create detrimental transportation impacts, such that the proposed development will **result in traffic volumes or circulation patterns that substantially exceed the capacity of streets and intersections likely to be used by traffic to and from the proposed development**;

(d) That the development will not create detrimental operational impacts, including potential impacts of hours of operation, **management of traffic, servicing and loading operations, and any on-site operations associated with the ongoing functions of the use on the site**, in consideration of adjacent and surrounding land uses which may have differing sensitivities to such operational impacts;

(e) That the development will not create detrimental health and safety impacts, including but not limited to potential impacts of noise, emissions, or vibrations from the proposed development, or functions within the proposed site which would otherwise affect the health or safety of others as a direct result of the operation of the proposed use;

(f) That the development will not create detrimental impacts on the future and potential development of parcels in the vicinity of the proposed site of the development; and

(g) That the development will not create detrimental impacts on property values.

Code § 922.07.D.1 (emphasis added).

Appellants argue that the ZBA properly denied Applicant's plans because:

[T]he proposed development is prohibited by virtue of the increase and extension of the prior nonconformity.

The [existing] structure on Parcel A complied with the build-to line requirement of [Section] 922.04.E.3.a [of the

20

Code[11]] along Penn Avenue. It complied with the ground floor transparency requirement of [Section] 922.04.E.3.b [of the Code[12]]. It complied with the Doorways and Entrances requirement of [Section] 922.04.E.3.c [of the Code[13]]. It had no front yard parking and was, therefore, in compliance with [Section] 922.04.E.3.e.i [of the Code[14]], though it did not meet all [Code Section] 922.04.E.3.e.ii[[15]] requirements. As proposed by [Applicant], its AutoZone store would satisfy none of these standards.

Parcel D was compliant in all respects. Now, Parcel D is proposed to be transformed into a parking lot which exceeds the accessory use limitations of [Section] 904.02.B.2 [of the Code[16]].

Appellants' Br. at 22 (citations omitted).

---

[11] "All new construction and/or enlargements shall maintain a sixty-five (65) percent building frontage along the established build-to line. Properties on corner lots shall maintain a sixty-five (65) percent building frontage on the primary frontage and shall maintain a fifty (50) percent building frontage on the secondary frontage." Code § 922.04.E.3.a.

[12] "The street[-]level facade shall be transparent between the height of three (3) feet and eight (8) feet above the walkway grade for no less than sixty (60) percent of the horizontal length of the building facade or shall include commercial-type windows and door openings." Code § 922.04.E.3.b.

[13] "All primary structures shall provide a prominent and highly visible street[-]level doorway or entrance on all facades of the building which front on a street. Main entrances to buildings should be emphasized using larger doors and framing devices such as deep overhangs, recesses, peaked roof forms and arches. To the maximum extent feasible, the entrance shall face a public street." Code § 922.04.E.3.c.

[14] "No parking spaces shall be located between the front building facade and the front lot line. No corner lot shall be used as off-street parking unless the parking area serves as a shared parking area." Code § 922.04.E.3.e.i.

[15] "Off-street parking spaces may be located on the side of buildings, provided that the facade of the building facing the parking area is transparent between the height of three (3) feet and eight (8) feet above parking area grade for no less than thirty (30) percent of the horizontal length of the building facade." Code § 922.04.E.3.e.ii.

[16] "Accessory uses shall be permitted in the LNC [Zoning] District in accordance with the Accessory Use regulations of [Code] Chapter 912. In addition, accessory uses in the LNC [Zoning] District shall not exceed twenty-five (25) percent of the gross floor area of the primary use." Code § 904.02.B.2. Notably, Section 912.03 of the Code defines parking as an accessory use in a nonresidential district.

21

Regarding the requested variances and special exceptions, the ZBA explained:

Section 922.09.E [of the Code] sets forth the general conditions the [ZBA] is to consider with respect to variances. . . . [T]he criteria for determining whether to grant a variance [are]: 1) unique circumstances or conditions of a property that would result in [] an unnecessary hardship; 2) no adverse effect on the public welfare; 3) the minimum variance that would afford relief with the least modification possible.

. . . .

[] The Code's special exception review criteria also require the [ZBA] to consider potential visual impacts, parking and traffic impacts, operational impacts and impacts on future and potential development in the vicinity.

[] **Applicant did not present sufficient evidence to demonstrate entitlement to the requested variances from the site plan review criteria set forth in Section 922.04.E.3 [of the Code] or the requested variance from Section 904.02.B.2 [of the Code] related to accessory parking.**

[] Applicant described topographical issues related to the site but did not demonstrate an unnecessary hardship that would warrant the grant of the requested variances.

[] Applicant presented only a site plan with general dimensions for the proposed use and only generally addressed the transparency, massing, proportions, scale, facade treatment and materials of the proposed building. It did not describe any specific efforts to adapt the proposed building to the context of the [] Property and its vicinity, specifically its location on the prominent corner of Penn and Negley Avenues.

[] Applicant's witnesses alluded to landscaping plans for the street frontage and the challenges of providing transparency within the existing topography of the site. However, it did not demonstrate that its retail store design was the only possible way of configuring a building and parking on the [] Property, in a manner compatible with the LNC District.

22

**[] Applicant's site plan indicated that the primary entrance to the building would face the parking lot, within the interior of the [] Property, with the rear of the building facing Negley Avenue, with the raised grade well above the street level. This configuration directly contravenes the requirement of Section 922.04.E.3.c [of the Code] that all primary structures 'shall provide a prominent and highly visible street level doorway or entrance on all façades of the building which front a street.'**

[**Appellants**] **presented credible testimony that a retail store could be located on the [] Property in a manner that complies with or is more consistent with the nature of the LNC [Zoning] District and the applicable site plan review criteria for that district.**

[] Applicant also **did not present any specific information regarding parking or traffic impacts from the proposed use.** Although a retail store had been located on the property, [] Applicant merely referenced the prior retail use and did not provide any comparative information as to traffic and parking impacts, based on the proposed use.

[] Applicant indicated that the hours of operation of the proposed use would be from 7:30 am until 9[:00] pm Monday through Saturdays and 9:00 am until 8:00 pm on Sundays but did not address how these hours, and the associated impacts, would compare to the prior use of the [] Property or uses, generally, in the vicinity.

[Appellants] **presented substantial and credible evidence that the proposed use would have detrimental traffic and parking impacts.**[17]

---

[17] Applicant contends that the ZBA should not have relied on Mudry's testimony because:

> [Mudry] has never prepared any traffic studies in [area neighborhoods] in any capacity prior to issuing his traffic report on this matter. [] *Mudry also testified that all of the alleged traffic access conflicts addressed in his report currently exist and would not be modified or otherwise affected by the redevelopment of the* [] *Property.*

[] In an effort to support its request for variances, [] Applicant presented testimony regarding the need to supply ADA-compliant access. However, **the access it proposed was consistent only with its proposed configuration of the site, designed to accommodate its proposed use, and did not address the possibility of other means of ADA-[compliant] access or other potential configurations of the site.**[18]

---

In fact, [] Mudry's calculations confirm that the minimal number of traffic trips generated by the proposed use are so insignificant that no traffic study is even required under the [Code], and that any potential impact would be negligible. [] Mudry was likewise not aware of the manner in which deliveries would be made to the site with respect to vans, short wheelbase tractor trailers or full size tractor trailers. However, despite the utter lack of knowledge, he concluded that there would be difficulties in delivery vehicles accessing the site.

Importantly, with respect to each of his conclusions regarding alleged traffic impact to the [] Property, [] Mudry states that *each of the concerns raised are the same as the existing current conditions of the site and would not be enhanced or would otherwise detrimentally affect the surrounding neighborhood in any manner.*

Applicant's Br. at 21-22 (citations omitted).

"It is the function of a ZHB to weigh the evidence before it. The ZHB is the sole judge of the credibility of witnesses and the weight afforded their testimony." *Lamar Advantage GP Co. v. Zoning Hearing Bd. of Adjustment*, 997 A.2d 423, 441 (Pa. Cmwlth. 2010) (citation omitted). The ZBA was free to evaluate Mudry's credibility and weigh his testimony accordingly. Based upon that testimony, the ZBA concluded that given the existing access, the proposed plans and the additional traffic, "the proposed use would have detrimental traffic and parking impacts." App. at 15a (COL No. 24).

   [18] In *Aquaro v. Zoning Board of Adjustment*, 673 A.2d 1055 (Pa. Cmwlth. 1996), this Court reversed a [ZBA]'s decision granting a variance to a dentist so the property could provide adequate access in accordance with the ADA. This Court held:

   [A] variance is not required to be granted per se where a property owner desires to conform with the ADA.

   Additionally, even if the ADA were applicable in zoning areas, all the ADA requires is that 'reasonable accommodations' through 'reasonable modifications' be made, which does not mean that the 'best' accommodation is required.

24

[] Applicant did not present sufficient substantial evidence to support the grant of any of the requested variances.

[] Applicant did not present sufficient evidence to warrant the grant of a special exception for a waiver from the Residential Compatibility Standards.

App. at 14a-15a (COL Nos. 12, 15-25) (emphasis added; citations omitted).

The record evidence reflects that the proposed parking lot, an accessory use under the Code, would use approximately 92% of the gross floor area of the primary use, more than three times Code Section 904.02.B.2's 25% requirement.[19] The proposed plan also fails to provide the required ground floor transparency required by Section 922.04.E.3.b of the Code. Further, the full rear wall of the proposed structure would face Negley Avenue, in violation of Section 922.04.E.3.c of the Code, which requires "[a]ll primary structures shall provide a prominent and highly[-]visible street level doorway or entrance on all facades of the building which front on a street." *Id.* Applicant had the burden to demonstrate its right to the requested relief, and the ZBA was entitled to judge witness credibility, weigh the evidence and determine whether Applicant met its burden. The ZBA considered the evidence presented by both Applicant and the Appellants, made credibility

_____

*Id.* at 1061. In contrast to *Aquaro*, some federal courts have held that enforcement of a zoning ordinance may constitute a regulated activity under the ADA. *See*, e.g., *RHJ Med. Ctr., Inc. v. City of DuBois*, 754 F. Supp. 2d 723 (W.D. Pa. 2010).

[19] In *O'Neill v. Zoning Board of Adjustment of Philadelphia County*, 254 A.2d 12 (Pa. 1969), our Supreme Court reversed a trial court's dismissal of an objector's appeal from the grant of a variance. There, the property owner sought to construct an apartment building where the city zoning code limited total floor space square footage. In reversing the trial court, the Supreme Court explained:

> [The property owner's] apartment building would be more than a mere technical and superficial deviation from the space requirements. The building would contain approximately two and one-half times as much floor space as is now permitted under the zoning regulation. In such a situation, petitioner's remedy would appear to be a rezoning and not a variance.

*Id.* at 16.

determinations, weighed the evidence, and ultimately found that Applicant failed to meet its burden. After reviewing the record evidence and the relevant legal authority, we conclude that the ZBA's decision is based on substantial record evidence, and we discern no legal error in the ZBA's analysis or an abuse of its discretion.

For all of the above reasons, the trial court's order is reversed, and the ZBA's decision is reinstated.

_____
ANNE E. COVEY, Judge

Judge McCullough did not participate in the decision in this case.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

5542 Penn LP                                          :
                              v.                       :
                                                       :
Zoning Board of Adjustment of the                      :
City of Pittsburgh, City of Pittsburgh,                :
Bloomfield-Garfield Corp., Joanne                      :
Tzortzis, The Friendship Community                     :
Group, Doug Cruze and The Highland                     :
Park Community Council                                 :
                                                       :
Appeal of: Bloomfield-Garfield Corp.,                  :
Joanne Tzortzis, The Friendship                        :
Community Group, Doug Cruze and       :    No. 2227 C.D. 2015
The Highland Park Community Council :


## O R D E R

AND NOW, this 20th day of December, 2016, the Allegheny County Common Pleas Court's October 8, 2015 order is reversed. The City of Pittsburgh Zoning Board of Adjustment's October 16, 2014 decision is reinstated.

_____
ANNE E. COVEY, Judge