IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Polish Hill Civic Association,           :
                    Appellant            :
                                         :
        v.                               :
                                         :
City of Pittsburgh Zoning Board of       :   No. 1129 C.D. 2021
Adjustment and Laurel Communities        :   Argued: October 11, 2022


BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION
BY JUDGE FIZZANO CANNON              FILED: November 8, 2022


        The Polish Hill Civic Association (Polish Hill) appeals from the September 15, 2021 order of the Allegheny County Court of Common Pleas (trial court) affirming the City of Pittsburgh Zoning Board of Adjustment's (Board) grant of zoning relief requested in connection with 1226 Herron Avenue in Pittsburgh (the Property). Upon review, we vacate and remand.[1]

---

[1] The City of Pittsburgh and the Board did not submit appellate briefs. *See* City of Pittsburgh Dep't of Law Letter, 3/15/22.

## I. Background

The Property is located in the Hillside zoning district (H District) of the Polish Hill neighborhood in Pittsburgh.[2] Board's Decision, 12/14/20 at 2, Findings of Fact (F.F.) 1-2, Reproduced Record (R.R.) at 171a. The Property consists of 34 recorded parcels, some of which were originally platted and recorded in a March 1869 subdivision plan, with the remainder platted and recorded in a November 1870 subdivision plan. F.F. 11; Transcript of Testimony, 9/17/20 at 17-18, R.R. at 67a-68a.

The provisions of the Pittsburgh Zoning Code (Code) became effective on February 26, 1999. *See* Code § 901.05. Of the 34 parcels on the Property, 26 currently fall short of the requisite minimum lot size of 3,200 square feet. F.F. 12. Six of the parcels contain structures and the remaining parcels are vacant or used for parking. F.F. 5. The combined area of the 34 parcels is approximately 99,698 square feet. F.F. 5.

Laurel Communities (Laurel) proposed consolidating and re-subdividing 33 of the parcels into 27 lots and constructing an attached single-family house on each new lot. F.F. 7; *see also* Zoning Application at 1-2, R.R. at 4a-5a. The new lots would range in size from 1,320 to 7,179 square feet, and 8 of these lots would not meet the Code's minimum lot size requirement of 3,200 square feet. F.F. 13 & 15. One parcel, No. 26-E-46, would retain its present lot boundaries and

---

[2] Laurel Communities (Laurel) avers in its appellate brief that it is the equitable owner of the 34 individually recorded lots on the Property. *See* Laurel's Br. at 4. The Board's decision identifies Donald Thinnes as the owner of the Property and Geoff Campbell as the applicant for the requested relief in connection with the Property. *See* Board's Decision, 12/14/20 at 1, R.R. at 170a. Neither individual is a party to the present suit. Laurel is participating in the present matter as an intervenor. *See* Trial Ct. Op., 9/15/21 at 1. Geoff Campbell submitted the application for zoning relief on behalf of Laurel. *See* Zoning Application at 1-2, R.R. at 4a-5a.

remain undeveloped. *Id.* Laurel requested that the Board recognize the protected status of the legal nonconforming lots or, in the alternative, a dimensional variance from the 3,200-square-foot minimum lot size requirement set forth in Code Section 905.02.C.3. F.F. 17. Laurel also requested dimensional variances from the 50% maximum area of disturbance limitation contained in Code Section 905.02.C.3 for 17 of the proposed 27 lots and from the restriction against cutting or filling slopes within five feet of property lines. F.F. 24 & 27. Additionally, Laurel sought a special exception to construct single-family attached dwellings on the Property. F.F. 10.

In September 2020, the Board conducted a hearing. *See* Transcript of Testimony, 9/17/20 at 1-2 & 59, R.R. at 51a-52a & 109a. On December 14, 2020, the Board issued a decision granting Laurel's requested relief. *See* Board's Decision, 12/14/20 at 1-11, R.R. at 170a-80a. The Board approved of the proposed dimensions of the eight noncompliant lots, and, "[t]o the extent . . . required," granted a dimensional variance from the Code's minimum lot size requirement. *Id.* at 11, R.R. at 180a; Conclusion of Law (C.L.) 14. The Board also granted the requested dimensional variance from the Code's 50% maximum disturbance area limitation to permit the disturbance of up to 51,959 square feet, or 57.9%, of the 89,679-square-foot development area, subject to the condition that no disturbance was to occur on the steep slope areas or on Parcel No. 26-E-46. C.L. 17-18. Further, the Board determined that a variance from the Code's restriction against cutting or filling slopes within five feet of property lines was appropriate to permit reasonable development, subject to the condition that no grading would occur on steep slope areas. C.L. 22. The Board concluded that constructing single-family attached residences on the Property was permissible as a special exception in H Districts under Code Sections 911.02 and 911.04.A.69, subject to the specific criteria

3

delineated in Code Section 911.04.A.69[3] and determined that Laurel presented substantial and credible evidence demonstrating that the proposed single-family attached residential use of H District property complied with the Code. C.L. 23 & 32. The Board acknowledged the objections raised by Polish Hill and individual residents, but found that objectors' generalized concerns failed to discharge their burden of proving a "high degree of probability" of specific detrimental impacts upon the public interest. C.L. 30-31 & 33 (quoting *Allegheny Tower Assocs., LLC v. City of Scranton Zoning Hearing Bd.*, 152 A.3d 1118, 1122 (Pa. Cmwlth. 2017)).

Polish Hill appealed to the trial court, which affirmed. *See* Notice of Land Use Appeal at 1-9, R.R. at 182a-90a; Trial Ct. Op., 9/15/21, Original Record at 103. The trial court observed that a property owner is permitted to maintain or reduce existing nonconformities without a variance. Trial Ct. Op., 9/15/21 at 3 (citing *Money v. Zoning Hearing Bd. of Haverford Twp.*, 755 A.2d 732 (Pa. Cmwlth. 2000)). The trial court disagreed with Polish Hill's contention that the proposed consolidation and re-subdivision would forfeit any protection afforded lawful nonconforming lots on the Property, explaining that "except for the fact that both Laurel and the Board used the term 'consolidation' to describe Laurel's proposed plans, no other evidence exists in the record that Laurel went through the consolidation process or intended to consolidate 33 parcels into one new lot." *Id.* at 4. Thus, the trial court concluded "that Laurel intend[ed] to adjust some of the boundaries to make the lots more conforming." *Id.* The trial court affirmed the

---

[3] The Code establishes conditions for single-unit detached and attached residential uses in the H District pertaining to topography, soil, vegetation, access and infrastructure, including the requirement that clusters of single-unit attached dwellings permitted by special exception in the H district shall not exceed four units. Code § 911.04.A.69(1)-(5).

4

Board's grant of the requested variances. *See id.* at 3-7.[4] Further, the trial court affirmed the Board's approval of Laurel's request for a special exception on the basis that the proposed development complies with the Code's requirements regarding single-unit attached residential use. *Id.* at 5-6 (citing Code §§ 911.02, 911.04.A.69; Exhibit 3, PS&R Report).[5] Like the Board, the trial court opined that the "general concerns" raised by Polish Hill and various individual community objectors at the hearing failed to satisfy their burden of proof as objectors. *Id.* at 7.

Polish Hill timely appealed to this Court.

## II. Issues

Before this Court,[6] Polish Hill argues that the Board erred in granting Laurel dimensional relief from the H District's minimum lot size, because Laurel's plan requires it to consolidate 33 of the 34 parcels into a single lot before re-dividing

---

[4] The trial court noted that the prerequisites for granting a variance are contained in Code Section 922.09.E, but did not recite or apply these requirements. *See* Trial Ct. Op., 9/15/21 at 4. Further, despite affirming the Board's opinion in its entirety, the trial court did not discuss the Board's grant of the requested dimensional variance from the Code's minimum lot size requirement. *See id.* at 3-4.

[5] The exhibits considered by the trial court were submitted to this Court as a separate file that is independent of the rest of the record. It is available alongside the original record in the Court's internal case records management system.

[6] "Because no additional evidence was presented to the trial court in [its] review of the Board's findings, our scope of review is limited to a determination of whether the Board committed a manifest abuse of discretion or an error of law." *Blancett–Maddock v. City of Pittsburgh Zoning Bd. of Adjustment*, 640 A.2d 498, 500 (Pa. Cmwlth. 1994). An abuse of discretion occurs when the Board's findings of fact are not based on substantial evidence in the record, which is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Mehring v. Zoning Hearing Bd. of Manchester Twp.*, 762 A.2d 1137, 1139 n.1 (Pa. Cmwlth. 2000). A conclusion that the zoning hearing board abused its discretion may be reached only if its findings are not supported by substantial evidence. *Money v. Zoning Hearing Board of Haverford Twp.*, 755 A.2d 732, 736 n.3 (Pa. Cmwlth. 2000).

it into 27 new lots. Moreover, Polish Hill maintains that Laurel has failed to provide any reason why its plan could not have further lessened or eliminated any remaining nonconformities.

Polish Hill also contends that any hardship purportedly justifying Laurel's dimensional variance based on the re-subdivision proposal request is self-inflicted and that Laurel's proposal will alter the character of the existing neighborhood. Further, Polish Hill maintains that Laurel's plan does not represent the minimum variance that would afford relief and does not represent the least modification possible of the regulation in issue.

Laurel counters that it does not plan to consolidate lots on the Property into a single lot before effectuating the proposed re-subdivision. Rather, it merely intends to adjust some of the boundaries to make the lots more conforming, which it may do as of right. Thus, Laurel posits that it is not obligated to reduce the nonconformity of any of the eight undersized lots proposed in the re-subdivision plan. *See id.* at 21-22.

Further, Laurel argues that merger of lots cannot be presumed merely because two adjoining lots come into common ownership. Merger of lots is a creature of local ordinance, not common law, and Laurel contends that the Code contains no merger provision.

Laurel also maintains that it is entitled to dimensional variances because the Property is subject to unique physical conditions, such as steep slopes, which hinder development. Laurel suggests that reducing the number of nonconforming lots would limit impact upon adjacent uses, permit the development to maintain additional greenspace and landscaping, minimize impact on steep slopes, enable the type of development described in Polish Hill's self-funded Neighborhood

6

Character Studies, and permit the development of pedestrian amenities otherwise unavailable on the Property. Finally, Laurel contends that it did not create the asserted hardships, as it did not alter the topography of the Property and the lots were created more than 50 years prior to the adoption of the Code.

## III. Discussion
### A. Nonconforming Lots

Polish Hill argues that Laurel's proposed re-subdivision of the Property would require an initial consolidation eliminating the protections accorded lawful nonconforming lots. In support of its contention, Polish Hill relies on Laurel's proposal in its proffered findings of fact and conclusions of law to "consolidate the existing 34 lots, which are comprised of 26 nonconforming lots, and re-subdivide the property into 28 lots,[7] 8 of which only will be nonconforming." Polish Hill's Br. at 19 (quoting Laurel's Proposed C.L. 16, R.R. at 146a). Polish Hill also points to the Board's statement that Laurel "proposes to consolidate and re-subdivide 33 of the existing 34 parcels into 27 parcels[.]"[8] *Id.* at 20 (quoting F.F. 7).

The Code states:

It is the general policy of the City to allow uses, structures *and lots* that came into existence legally in conformance with then-applicable requirements to continue to exist and be put to productive use, but to bring as many aspects of such situations into compliance with existing regulations as is reasonably possible. This chapter establishes regulations governing uses, structures and lots that were lawfully established but that do not conform to

---

[7] Laurel's statement that 28 lots would remain following re-subdivision apparently incorporates Parcel No. 26-E-46.

[8] The Board's reference to re-subdivision resulting in 27 lots excludes Parcel No. 26-E-46. *See* F.F. 7 & 15.

one (1) or more existing requirements of this Code. The regulations of this chapter are intended to:

> 1. Recognize the interests of property owners in continuing to use their property;
>
> 2. Promote reuse and rehabilitation of existing buildings;
>
> 3. Place reasonable limits on the expansion of nonconformities that have the potential to adversely affect surrounding properties and the community as a whole; and
>
> 4. Protect the integrity of residential neighborhoods from the potential impacts of nonconforming uses.

Code § 921.01.A (emphasis added). Polish Hill fails to point to a Code provision predicating the perpetuation or alteration of dimensionally nonconforming lots on the receipt of a variance or other relief, nor does our review of the Code indicate that any such provision exists. *See Campbell v. Doylestown Borough Zoning Hearing Bd.* (Pa. Cmwlth., No, 274 C.D. 2012, filed Jan. 7, 2013), slip op. at 13.

In *Campbell*, a landowner sought to merge two nonconforming properties into a single nonconforming property that would remain undersized. *Id.*, slip op. at 1. The zoning hearing board granted the requested relief. *Id.* This Court affirmed, noting that the applicable zoning ordinance "[did] not impose any additional requirement that [an a]pplicant seek a variance for minimum lot size when such a dimensional nonconformity already exists and the nonconformity will be reduced by the [p]roposed [u]se." *Id.*, slip op. at 13.[9]

---

[9] The landowner also requested a special exception to convert two nonconforming uses on the two separate lots into a single nonconforming use, which would be located on the proposed merged lot. *Campbell*, slip op. at 1. We affirmed the Board's grant of the requested special exception, reasoning that the applicable zoning ordinance did not precondition the receipt of a special exception on conformance with every dimensional requirement for the district. *Id.*, slip op. at 14.

8

Here, the 34 parcels on the Property were platted and recorded in 1869 and 1870. F.F. 11-12. The subsequent adoption of the Code's 3,200-square-foot minimum lot size requirement rendered 26 of these parcels undersized and, thus, dimensionally nonconforming.[10] *See* F.F. 12; Code § 905.02.C.3. Laurel proposes to re-divide 33 parcels into 27 larger lots, of which only 8 would remain nonconforming. *See* F.F. 7, 12 & 15. However, in *Campbell*, the proposed undersized lot resulted from the merger of two lawfully nonconforming parcels. *See Campbell*, slip op. at 1 & 13. By contrast, here, the Board failed to determine whether the 8 nonconforming lots proposed by Laurel's re-subdivision plan would be located within any of the 26 preexisting lawful nonconforming lots.[11]

---

[10] The Board did not render a factual finding as to whether the Code incorporated the 3,200 square-foot-minimum lot size requirement upon the initial adoption of the Code or through subsequent amendment, merely stating that "the nonconforming areas of 26 of the existing 34 parcels predated the Code's minimum lot size requirement[.]" F.F. 17.

[11] Laurel cites *Money* and *Amoco Oil Co. v. Ross Twp. Zoning Hearing Bd.*, 426 A.2d 728 (Pa. Cmwlth. 1981), in support of its assertion that it may, as of right, re-subdivide the existing lots on the Property to reduce legal nonconformities. We note, however, that *Money* and *Amoco* do not squarely support Laurel's position. In *Money*, a landowner applied to the township for a building permit to replace a nonconforming garage/chicken coop with a smaller, but still nonconforming garage. *Money*, 755 A.2d at 735. This Court did not hold that the landowner possessed the unlimited right to perpetuate the nonconforming use. *See id.* at 738-39. Rather, we held that because the new structure proposed by the landowner would have the effect of reducing the nonconformity, the Board erred in concluding that a provision of the zoning ordinance pertaining to extensions, enlargements or additions of nonconforming uses, buildings or structures prohibited the landowner's proposal. *Id.* at 736 & 736 n.4. Accordingly, we reversed and remanded the matter for the zoning hearing board to grant the landowner the requested permit. *Id.* at 739. Thus, the status of the garage/chicken coop as lawfully nonconforming did not obviate the landowner's need to obtain a building permit under the relevant zoning ordinance in order to replace the structure. *See id.*

Likewise, we deem *Amoco* inapposite, as that matter centered on whether a landowner's proposed conversion of the lawful nonconforming use of a gas station from full service to self-service constituted the reasonable and natural expansion of the use for purposes of the landowner's requests for a special exception and variances. *See* 426 A.2d at 730-32.

Critically, the Board also failed to address whether the lots were in common ownership prior to the adoption of the Code's minimum lot size requirement, or whether they came into common ownership after that time.[12] In *Cottone v. Zoning Hearing Board of Polk Township*, 954 A.2d 1271 (Pa. Cmwlth. 2008), we explained:

> We begin with a review of merger principles. In general, mere common ownership of adjoining properties does not *automatically* result in a physical merger of the properties for zoning purposes. *Dudlik [v. Upper Moreland Twp. Zoning Hearing Bd.*, 840 A.2d 1048, 1052-53 (Pa. Cmwlth. 2004)]; *Daley v. Zoning Hearing [Bd.] of Upper Moreland [Twp.]*, 770 A.2d 815, 819 (Pa. Cmwlth. 2001). On the other hand, adjoining properties under common ownership can merge when a zoning ordinance provision causes one or more of the adjoining lots to become undersized, depending on the facts and circumstances of each case. [*Twp.] of Middletown v. Middletown* [Twp.] *Zoning Hearing [Bd.]*, . . . 548 A.2d 1297, 1300 ([Pa. Cmwlth.] 1988). The focus of the inquiry is upon (1) when the properties in question came under common ownership and (2) the effective date of the applicable zoning ordinance.
>
> Adjoining lots under separate ownership before a zoning ordinance enactment makes the lots too small to build upon are presumed to remain separate and distinct lots. Should those adjoining, undersized lots be thereafter acquired by a single owner, the burden is on the municipality to show that the new common owner has merged the two lots into one. *In re Appeal of Puleo,* 729 A.2d 654, 656 (Pa. Cmwlth.1999). Otherwise, the result would be to permit separate development of each lot by any person other than the common owner. *Parkside*

---

[12] Although the Board identified Donald Thinnes as the owner of the Property on the cover sheet of its December 14, 2020 decision, the Board did not specifically find as fact whether the 34 lots on the Property were in common ownership. *See* Board's Decision, 12/14/20 at 1, R.R. at 170a.

10

[*Assocs.*], *Inc. v. Zoning Hearing* [*Bd.*] *of Montgomery* [*Twp.*], . . . 532 A.2d 47, 49 ([Pa. Cmwlth.] 1987).

. . .

On the other hand, lots are presumed to merge as necessary to comply with a zoning ordinance's lot size requirements where they are under common ownership prior to the passage of the ordinance. It is the landowner's burden to rebut this presumption by proving an intent to keep the lots separate and distinct. *In re Appeal of Puleo*, 729 A.2d at 656. In doing so, the landowner's subjective intent is not determinative; rather, there must be proof of some overt or physical manifestation of intent to keep the lots in question separate and distinct. *Dudlik*, 840 A.2d at 1052-1053.

*Cottone*, 954 A.2d at 1275-76 (footnote omitted). Thus, the Board's failure to address whether and when the lots came into common ownership precludes the ability to ascertain which party bears the burden of demonstrating whether the lots are lawfully nonconforming. *See id.*

Moreover, the Board did not discuss whether any of the 26 undersized lots on the Property meet the definition of "nonconforming lot," as set forth in Code Section 921.04:

A lot shown on an approved and recorded subdivision plat or a parcel shown on the Allegheny County Record Of Deed's records as a separate parcel on such date may be occupied and used although it may not conform in every respect with the dimensional requirements of this Code, subject to the provisions of this section.

Code § 921.04 (titled "Nonconforming Lots"). Although the Board found that "[t]he 34 parcels that currently comprise the site were originally laid out in two recorded subdivision plans, one recorded in March 1869 . . . and one in November 1870," it failed to specifically address whether any of the 26 currently undersized parcels were originally recorded as "separate parcel[s]" for purposes of Code Section 921.04.

11

Accordingly, the trial court erred in affirming the Board's approval of Laurel's re-subdivision plan.[13]

## B. Dimensional Variance Requests

We also agree with Polish Hill that the trial court erred in affirming the Board's grant of the requested dimensional variances. Pursuant to Code Section 922.09.E,

> [n]o variance in the strict application of any provisions of this [] Code shall be granted by the [Board] unless it finds that *all* of the following conditions exist:
>
> 1. That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property, and that the unnecessary hardship is due to the conditions, and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located;
>
> 2. That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property;
>
> 3. That such unnecessary hardship has not been created by the [applicant];
>
> 4. That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or

---

[13] Further, we observe that the Board failed to consider the Code's policy to encourage owners of nonconforming lots "to bring as many aspects of such situations into compliance with existing regulations as is reasonably possible." Code § 921.01.A.

12

permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and

5. That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

In granting any variance, the board may attach such reasonable conditions and safeguards as it may deem necessary to implement to purposes of this act and the zoning ordinance

The applicant shall have the burden of demonstrating that the proposal satisfies the applicable review criteria.

Code § 922.09.E (emphasis added).

"[T]he quantum of proof required to establish unnecessary hardship is [] lesser when a dimensional variance, as opposed to a use variance, is sought." *Hertzberg v. Zoning Bd. of Adjustment of City of Pittsburgh*, 721 A.2d 43, 47-48 (Pa. 1998). Our Supreme Court has explained:

When seeking a dimensional variance within a permitted use, the owner is asking only for a reasonable adjustment of the zoning regulations in order to utilize the property in a manner consistent with the applicable regulations. Thus, the grant of a dimensional variance is of lesser moment than the grant of a use variance, since the latter involves a proposal to use the property in a manner that is wholly outside the zoning regulation.

*Id.* at 47. "Although the standards for a dimensional variance are less strict than a use variance, an applicant still 'ha[s] the burden of demonstrating that the proposal satisfies the applicable review criteria' established in the requirements of [Code] Section 922.09.E[.]" *Lawrenceville Stakeholders, Inc., v. Zoning Board of Adjustment of the City of Pittsburgh* (Pa. Cmwlth. No. 1518 C.D. 2015, filed Apr.

13

12, 2016), slip op. at 6 (quoting *Lamar Advantage GP Co. v. Zoning Hearing Bd. of Adjustment of City of Pittsburgh*, 997 A.2d 423, 443 (Pa. Cmwlth. 2010) (quoting Code § 922.09.E)).

Here, the Board rendered the following factual findings pertaining to Laurel's requested dimensional variance from the 50% maximum lot disturbance requirement contained in Code Section 905.02.C.3:

18. Of the existing 34 parcels, 19 are either wholly or partially within areas affected by steep slopes.

19. The grade of the steep slopes on the upper/southern portion of the site exceeded 30%.

20. [Laurel] does not intend any development in the steep slope areas of the site, including the entirety of parcel No. 26-E-46.

21. The grade of the portion of the site to be developed is generally flat with some slopes of no more than 3%.

22. Of the approximately 99,698 [square feet] of the combined area of the parcels that comprise the site, the proposed development would result in the disturbance of approximately 51,959 [square feet] or 52.1% of the site. Excluding from that calculation the 10,019[-square- foot] area of Parcel No. 26-E-46, which is not to be disturbed, the 51,959[-square-foot] area of disturbance would be approximately 57.9% of the 89,679[-square- foot] development site.

23. [Laurel] submitted a slope stability analysis, which indicated that the existing soils and slopes on the site [were] stable, in excess of industry standards, and that the development of the site would help to improve slope stability.

24. In support of its request for a variance from the 50% maximum area of disturbance limitation, [Laurel] relies on the site development challenges associated with the topography of the area. [Laurel] also notes that the

14

nonconforming condition of the existing lots would require more than 50% disturbance of each of the existing lots and that strict enforcement of the site disturbance provision would preclude any reasonable development of the site for any permitted use.

F.F. 18-24. The Board determined that Laurel was entitled to the requested dimensional variance on the basis that "any reasonable development of the site would require disturbance of more than 50% of the site or 50% of each existing parcel." C.L. 16. The Board further concluded that upon consideration of "the unique conditions of the site and [Laurel's] representation that the steep slopes on the site and parcel No. 26-E-46 [would] not be disturbed, . . . a dimensional variance to allow a maximum disturbance of 57.9% of the 89,697[-square-foot] development area [was] appropriate," provided that no disturbance was to occur within steep slope areas or on Parcel No. 26-E-46. C.L. 18.

The Board rendered the following factual findings with respect to Laurel's requested dimensional variance from the requirement that a property owner refrain from cutting or filling slopes within five feet of property lines, as set forth in Code Section 915.02.A.1.d:

> 25. [Laurel] does not propose grading on steep slopes or within 5 [feet] of existing residential structures.
>
> 26. The grading would not impact vegetation on steep slopes.
>
> 27. [Laurel] asserted that the development of the existing 34 lots would require grading within 5 [feet] of all property lines to allow for reasonable development and that the proposed grading plan for the new parcels would reduce impacts on the hillside.
>
> 28. [Laurel's] slope stability analysis report indicates that the existing soils and slopes on the site are stable and that

15

the proposed development would not affect the existing slope stability.

29. The grade change from the public roadways to the site and topographical changes with[in] the site's interior are unique conditions of the [P]roperty.

30. To support the variance request, [Laurel] again relies on the site development challenges associated with the topography of the area and notes that [] strict enforcement of the grading provisions would preclude any reasonable development of the site for any permitted use.

F.F. 25-30. The Board determined that "any reasonable development of the site would require cut[ting] or fil[ling] within 5 [feet] of property lines throughout the site," such that the requested dimensional variance was "appropriate to allow reasonable development, subject to the condition that no grading occur[] on steep slope areas." C.L. 21-22. The Board also noted that Laurel's re-subdivision plan would reduce the number of parcels requiring a variance from this provision. C.L. 19.

The Board found as fact, though it did not conclude as a matter of law, that deviation from the Code's 50% maximum lot disturbance provision was necessary, as "strict enforcement" thereof "would preclude any reasonable development of the site for any permitted use." F.F. 24. This finding corresponds to the requirement that the Board consider whether physical circumstances or conditions preclude any possibility of development of a property in strict conformity with the Code and whether the requested variance is therefore necessary to enable the reasonable use of the property. *See* Code § 922.09.E(2).

Regarding the Code's requirement that a property owner refrain from cutting or filling slopes within five feet of property lines, the Board concluded that the requested variance was necessary to permit any reasonable development of the

16

site. *See* C.L. 21-22; Code § 922.09.E(2). The Board also touched upon the first criterion under Code Section 922.09.E(1) in finding that certain topographical features of the Property constituted unique physical conditions. *See* F.F. 29; *See* Code § 922.09.E(1). However, the Board again failed to address the remaining prerequisites for a variance mandated by Code Section 922.09.E. "The failure of a zoning board to consider each requirement of a zoning ordinance prior to granting a variance is an error of law." *Larsen v. Zoning Bd. of Adjustment*, 672 A.2d 286, 289-90 (Pa.1996). Thus, the trial court erred in affirming the Board's grant of the requested dimensional variances. *See id.*; *see also Doris Terry Revocable Living Tr. v. Zoning Bd. of Adjustment of City of Pittsburgh*, 873 A.2d 57, 64 (Pa. Cmwlth. 2005) (reversing trial court's decision upholding grant of dimensional variance, where the zoning hearing board failed to render "enough facts to support a conclusion that the requested variance satisfied each requirement specified in [Code] Section 922.09.E"); *Lawrenceville*, slip op. at 6 (holding, *inter alia*, that the landowner failed to present evidence establishing that the requested dimensional variance would represent the least modification possible of the regulation at issue).

## C. Special Exception

Polish Hill similarly asserts that Laurel's re-subdivision plan proposes the initial consolidation of all adjoining lots on the Property into one conforming lot, thereby defeating any protection for lawful nonconforming lots pursuant to the doctrine of merger, because Laurel failed to exhibit an intent to keep the lots separate and distinct. Polish Hill's Br. at 22-24 (citing *Dudlik*, 840 A.2d at 1053-54; *Price*, 569 A.2d at 1031-33). Laurel counters that the "merger of lots doctrine is only triggered where a local municipality has adopted a merger of lots provision."

*See* Laurel's Br. at 26 (quoting *Loughran v. Valley View Developers, Inc.*, 145 A.3d 815, 821-22 (Pa. Cmwlth. 2016)).  Laurel requests that this Court take judicial notice that the Code contains no merger provision.  *Id.*  For the reasons that follow, we decline to do so.

> As noted above, the Code provides that
>
> [a] lot shown on an approved and recorded subdivision plat or a parcel shown on the Allegheny County Record Of Deed's records *as a separate parcel on [the Code's effective] date* may be occupied and used although it may not conform in every respect with the dimensional requirements of [the] Code, subject to the provisions of this section.

Code § 921.04 (emphasis added).  The Code further specifies:

> *If the lot or parcel was vacant on the date which [the C]ode became applicable to it and is in separate ownership from abutting lots or parcels*, then the Zoning Administrator shall approve the use of the lot as an Administrator Exception for a single-unit residential use, *or the Zoning Board of Adjustment shall approve, as a special exception, the lot for a conforming use permitted in the district in which the lot is located*, according to the following standards:
>
> 1. The use and structure shall comply with all applicable dimensional requirements of the code to the extent practicable; and
>
> 2. If the applicable zoning district permits a variety of uses or a variety of intensities of uses, and one (1) or more uses or intensities would comply with applicable setback requirements while others would not, then only the uses or intensities that would conform with the applicable setback requirements are permitted.

Code § 921.04.A (emphasis added).  Code Section 911.02, titled "Use Table," also indicates that single-unit attached residential dwellings are permitted in the H

18

District by special exception. Moreover, "the minimum lot size standards of th[e] Code shall not be interpreted as prohibiting the construction of a single-unit residential dwelling unit on a lot that was legally platted or recorded prior to the adoption of this Code." Code § 925.01.C(1).[14] "Entitlement to a special exception is predicated on an applicant's satisfying the special exception criteria contained in the ordinance." *N. Pugliese, Inc. v. Palmer Twp. Zoning Hearing Bd.*, 592 A.2d 118, 122 (Pa. Cmwlth. 1991).

In *Dudlik*, a property owner applied to the township's zoning hearing board for a special exception to construct a single-family residence on an undersized lot. *See* 840 A.2d at 1049. The relevant portion of the township's zoning ordinance provided as follows:

> On any lot that has been or hereafter is rendered nonconforming as to the lot area or lot width regulations of the district in which it is located by the terms of this ordinance or any amendments thereof, and which, *at the time it acquires such nonconforming status, was held in a single and separate ownership and thereafter continues to be held in single and separate ownership*, a building may be erected when authorized as a special exception by the Zoning Hearing Board.

*Id.* at 1051.[15] The township's zoning code defined the phrase "Lot held in Single and Separate Ownership" as "[a] lot the owners of which are not identical with the

---

[14] "A single unit dwelling on a recorded zoning lot with a lot area less than otherwise required by the [Code] . . . may be approved as an Administrator's Exception according to the provisions of Section 922.08." Code § 925.01.C(2).

[15] This Court has explained the approaches available to municipalities in the regulation of preexisting, dimensionally nonconforming lots as follows:

> The particular issue of nonconformance we are concerned with in the instant matter is nonconformance that arises when one of two

19

owners of any lot adjoining the rear or either side of said lot." *Id.* The township's zoning hearing board denied the request for a special exception on the ground that the nonconforming lot was not held in single and separate ownership at the time the township's zoning code was enacted. *Id.* at 1050. This Court affirmed, reasoning:

> Th[e township's zoning] ordinance defines . . . a lot [held in single and separate ownership] as a lot "the owners of which are not identical with any lot adjoining . . . . " That definition legislatively imposes the result that the Court declined to impose under language such as that in *Parkside*

separate yet contiguous lots held by the same owner has been rendered undersized by the passage of an ordinance requiring a larger lot size than what was previously required for the permitted use in the zoning district where the lots are located; in such instances, the undersized lot becomes a "nonconforming lot." Many municipalities within the Commonwealth have adopted provisions in their zoning ordinances specifically aimed at addressing this event, often by requiring that the nonconforming lot merge with the commonly held adjoining lot in order to create one contiguous lot that is in conformity with the applicable zoning ordinance. Yet, adoption of a merger of lots provision is not the only avenue available to local municipalities in the event that a nonconforming lot is created by changes to the zoning ordinance. Many municipalities within the Commonwealth have declined to adopt ordinances specifically addressing nonconformance or requiring merger of adjacent lots held by the same owner in the event that a zoning ordinance renders one of those lots nonconforming, preferring instead to address nonconformance through the process established by the [Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202] for issuing variances. In each instance, the decision to adopt or forgo a merger provision is a decision that requires the governing body of the local municipality to balance a host of often competing interests and settle upon the policy that is deemed most beneficial for the particular needs of the community the governing body serves.

*Loughran*, 145 A.3d at 820-21 (footnote omitted).

20

[*Associates, Inc. v. Zoning Hearing Board of Montgomery Township*, 532 A.2d 47, 48 (Pa. Cmwlth. 1987)], which required only ownership that was "separate and distinct" from that of adjoining property. Under this ordinance, therefore, common ownership at the time of enactment of the zoning change is sufficient to merge properties for zoning purposes, and the [township zoning hearing board's decision] so deeming them to be merged was the correct result.

*Id.* at 1053. Here, the Code does not separately define the term "separate ownership" for purposes of construing Code Section 921.04.A.[16] Thus, unlike in *Dudlik*, common ownership is not sufficient to merge properties for purposes of Code Section 921.04. *See id.* The Board, therefore, should have considered whether any physical manifestation on the land indicates that the nonconforming lots upon which Laurel seeks to build following re-subdivision of the Property are currently held in "separate ownership."[17]

This Court went on to explain in *Dudlik* that

---

[16] Code Section 901.07.E provides that "[w]ords and phrases shall be construed according to the common and approved usage of the language, but technical words and phrases that may have acquired a peculiar and appropriate meaning in law shall be construed and understood according to such meaning." Code § 901.07.E.

[17] We note that the applicable provision of the township's zoning ordinance in *Dudlik* required a lot to be held in single and separate ownership "at the time it acquire[d] such nonconforming status." 840 A.2d at 1051. By contrast, the provision of the Code at issue here permits the granting of a special exception for a "lot or parcel [that] was vacant on the date which this code became applicable to it and *is* in separate ownership from abutting lots or parcels[.]" Code § 921.04.A (emphasis added). Nevertheless, when construed alongside the Code's definition of the term "nonconforming lot," it appears that the Code requires a dimensionally nonconforming lot both to have been originally recorded "as a separate parcel" and to remain "in separate ownership[.]" *Id.*; Code § 921.04 (providing that "[a] lot shown on an approved and recorded subdivision plat or a parcel shown on the Allegheny County Record Of Deed's records as a separate parcel *on such date* may be occupied and used although it may not conform in every respect with the dimensional requirements of this Code, subject to the provisions of this section").

21

in many cases an ordinance permits building upon a lot later rendered nonconforming where adjoining lots were held in single and separate ownership, and it defines that term simply as ownership that is separate and distinct from that of adjoining property. In such cases the Court has held that a common owner of adjoining parcels at the time of enactment may nevertheless attempt to prove by physical evidence an intent to hold and to use them separately.

840 A.2d at 1053. We also explained in a separate matter:

[W]e do not believe that the subjective intent of the owner is the deciding factor in a determination of whether a lot was held in "single and separate ownership." The terms "single," "separate," and "distinct" describe characteristics of ownership which cannot be realized except by some physical manifestation on the land. While an owner can certainly *intend* to own a lot in single and separate ownership, he has not achieved his intention until he has, through some affirmative action, made his lot separate and *distinct* from his other holdings. In this respect, an owner's burden to establish "single and *separate* ownership" is analogous to an owner's burden to establish a nonconforming use.

*W. Goshen Twp. v. Crater*, 538 A.2d 952, 954 (Pa. Cmwlth. 1988). This Court has held that the requisite physical manifestation of an intention to keep adjoining lots separate and distinct may consist of, for instance, "a line of trees" or "a fence or wall separating the lots." *Cottone*, 954 A.2d at 1279. However, "abstract legal attributes" such as whether the property owner purchased the lots at the same time and whether the properties have separate deeds and separate tax identification numbers "do not carry the day." *Id.*

"An applicant for a special exception has both the duty of presenting evidence and the burden of persuading the zoning board that his proposal is in compliance with all of the objective requirements of the ordinance." *Appeal of*

22

*Phila. Ctr. for Dev. Servs., Inc.*, 462 A.2d 962, 965 (Pa. Cmwlth. 1983).[18]   Thus, here, Laurel bore the burden of demonstrating entitlement to the requested special exception by establishing that its development proposal comported with the objective requirements of the Code.  *See id.*  The Board erred in failing to address whether Laurel met its burden of establishing, for instance, whether the owner of the Property demonstrated an intent through physical manifestations on the land to keep the nonconforming lots for which Laurel requested a special exception "in separate ownership from abutting lots or parcels."  Code § 921.04.A; *see also W. Goshen Twp.*, 538 A.2d at 955 (concluding that to qualify for a special exception, landowners were required to "prove by objective evidence that [the lot at issue] was 'separate and distinct' and not part of a larger, integrated tract owned by them, or by a predecessor, at the time of the ordinance's enactment").  Moreover, the Board erred in failing to address whether these lots were vacant on the date which the Code became applicable to them.[19]   Accordingly, the trial court erred in affirming the Board's grant of the requested special exception to construct single-family residences on nonconforming lots on the Property.  *See Appeal of Phila.*, 462 A.2d at 965-66 (vacating trial court's reversal of township zoning hearing board's denial of special exception application and remanding to the trial court either to take

---

[18]   "If the objective requirements are met, it then becomes the protestants' duty to present evidence and persuade the zoning board that the proposed use will either conflict with the general policy standards of the ordinance or will have a detrimental impact on the public health, safety and welfare.  Moreover, protestants must establish to a high degree of probability that the proposed use will substantially and detrimentally affect the public health, safety and welfare." *Appeal of Phila. Ctr. for Dev. Servs., Inc.*, 462 A.2d 962, 965-66 (Pa. Cmwlth. 1983) (citations omitted).

[19] Evidence of record indicates that the Property is not entirely vacant.  *See, e.g.*, Transcript of Testimony, 9/17/20 at 26, R.R. at 76a (testimony on behalf of Laurel regarding "an existing structure located" on the northern side of the Property and the proposed demolition of a home elsewhere on the Property); *see also* F.F. 5 (stating that six of the parcels contain structures).

additional evidence or to remand the matter to the Board to render "[f]indings and conclusions" regarding the "'objective' standards in the ordinance pertaining to applicant's special exception request").[20]

## IV. Conclusion

For the above-stated reasons, the September 15, 2021 order of the trial court is vacated, and this matter is remanded to the trial court with instructions to remand to the Board to take additional evidence, if necessary, and to render a decision in accordance with the foregoing opinion.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[20] Polish Hill does not specifically challenge the trial court's affirmance of the Board's approval of a special exception for construction of single-family attached residential dwellings following re-subdivision of the Property. Nevertheless, we find that, although raised in the context of its argument that Laurel's proposed consolidation and re-subdivision of the Property would forfeit any protections enjoyed by lawful nonconforming lots on the Property, Polish Hill's invocation of the merger doctrine directly implicates Laurel's special exception request. *See Price*, 569 A.2d at 1035 (noting "that special exception entitlements can run with the land as long as owners take no affirmative action to change the separate and distinct character of a nonconforming lot," and affirming the Board's conclusion "that the [the prior owners'] joint ownership of the lots, and [the present owner's] subsequent use of the two lots as one lot, in apparent conformity with the zoning ordinance, caused a merger of the lots, thus precluding him from obtaining the benefit of the special exception provision").

24

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Polish Hill Civic Association,       :
               Appellant     :
                           :
       v.              :
                           :
City of Pittsburgh Zoning Board of   :   No. 1129 C.D. 2021
Adjustment and Laurel Communities  :

## O R D E R

AND NOW, this 8th day of November, 2022, the September 15, 2021 order of the Allegheny County Court of Common Pleas (trial court) is VACATED. This matter is remanded to the trial court with instructions to remand to the City of Pittsburgh Zoning Board of Adjustment to take further evidence, if necessary, and to render a decision in accordance with the foregoing opinion.

Jurisdiction relinquished.

_____
CHRISTINE FIZZANO CANNON, Judge